[L. A. No. 23892. In Bank. June 28, 1956.]

VICTOR DESNY, Appellant, v. BILLY WILDER et al., Respondents.

Milo V. Olson and Frank DeMarco, Jr., for Appellant.

Pacht, Ross, Warne & Bernhard, Isaac Pacht and Gordon Stulberg as Amici Curiae on behalf of Appellant.

O'Melveny & Myers, W. B. Carman, William W. Alsup, Everett B. Clary, Philip F. Westbrook, Jr., Louis W. Myers, Sidney Justin and Melville B. Nimmer for Respondents.

Loeb & Loeb, Mitchell, Silberberg & Knupp, Cruikshank, Jones & Gershon, Herman F. Selvin and Harry L. Gershon as Amici Curiae on behalf of Respondents.

SCHAUER, J.—Plaintiff appeals from a summary judgment rendered against him in this action to recover the reasonable value of a literary composition, or of an idea for a photoplay, a synopsis of which composition, embodying the idea, he asserts he submitted to defendants for sale, and which synopsis and idea, plaintiff alleges, were accepted and used by defendants in producing a photoplay.

The case as presented to us is perplexed by manifold problems, some of which appear only upon a composite view of the pleadings, the evidence, and the briefs on appeal. Among the questions are these: Is the plaintiff seeking to recover for (a) the conveyance[1] of an abstract idea or (b) the sale

---

[1] Lest there be some who would question use of the word "conveyance" in this connotation, it is noted that no less an authority than Coleridge speaks of "words that convey feelings, and words that flash images." For general use in this opinion the term "conveyance" seems slightly more accurate than the word "disclosure."

of a literary property? Or (c) is he clutching at both theories? (d) Does plaintiff's evidence tend to show an express or implied contract or (e) facts from which the law might impose a so-called quasi-contractual obligation, as to either the idea or the synopsis? The ultimate question is (f), Does the record permit the conclusion that there is no triable issue of material fact pertinent to any tenable theory available to plaintiff?

To answer the above listed questions with any substantial degree of confidence requires statement of the factual substance of the record, explanation of the nature of the judgment appealed from and the rules governing our consideration of it, together also with some discussion of the law of ideas, the law of literary property, and the law of contracts as it relates to transactions concerning ideas and literary property, with definitive recognition of the somewhat differing situations to which, as descriptive of the "contract" or obligation, some authorities apply the terms "express," "inferred," "implied in fact," "implied-in-law" or "quasi-contractual," and the significance of the subjective and objective tests in determining contractual existence under the several possibly pertinent theories.

After threading the maze, we have concluded, for reasons hereinafter stated, that the summary judgment in favor of defendants was erroneously granted and should be reversed.

*The Pleadings.* The complaint[2] alleges (Count I) that "Plaintiff conceived, originated and completed a certain untitled literary and dramatic composition (hereinafter called 'Plaintiff's Property') based upon the life of Floyd Collins. Plaintiff has, at all times . . . been, and now is, the sole . . . owner of Plaintiff's Property, . . . Plaintiff submitted Plaintiff's Property to the Defendants . . . In making said submission, Plaintiff stated . . . that it was made for the purpose of sale of Plaintiff's Property to Defendants to be used . . . only if Defendants paid to Plaintiff the reasonable value thereof. Defendants accepted submission of Plaintiff's Property . . . [Shortly after accepting submission of plaintiff's property defendants] commenced the preparation of and . . . actually photographed a motion picture photoplay entitled 'ACE IN THE HOLE,'[3] [and have exhibited the same] . . . At all times [concerned] . . . the Defendants knew . . .

[2]For brevity, plaintiff's first amended complaint is referred to as the complaint.

[3]Assertedly sometimes distributed as "The Big Carnival."

that the Plaintiff expected them to pay him the reasonable value of Plaintiff's Property if used by them. With such knowledge . . . the Defendants did copy and use Plaintiff's Property in and in connection with said motion picture photoplay." That the reasonable value of plaintiff's property at the time of use was $150,000, "no part . . . of which has been paid." We do not consider Counts II and III, as plaintiff concedes that as to them the judgment should be affirmed.

The material allegations of the complaint were denied by defendants in their answer. Thereafter defendants filed notice of motion for summary judgment. The motion was heard upon affidavits filed by defendants and upon plaintiff's deposition, which is treated as an affidavit in opposition to the motion. The judgment entered upon the granting of such motion is the subject of this appeal.

Inasmuch as the contentions of the parties are largely related, directly or indirectly, to the significance and sufficiency of the evidence, and as all evidential contentions must be resolved in the light of the rules governing summary judgment proceedings it is desirable, before undertaking discussion of the principal problems, to indicate the pertinent rules concerning summary judgments.

*The Law of Summary Judgments.* Motions for summary judgment are provided for in section 437c of the Code of Civil Procedure. ■ The principles to be observed in proceeding under that section are stated as follows in *Eagle Oil & Ref. Co.* v. *Prentice* (1942), 19 Cal.2d 553, 555-556 [122 P.2d 264]: The issue to be determined by the trial court in ruling upon a motion for summary judgment is whether or not the party opposing the motion "has presented any facts which give rise to a triable issue or defense, and not to pass upon or determine the issue itself, that is, the true facts in the case. [Citations.] . . . ■ [T]he better rule is that the facts alleged in the affidavits of the party against whom the motion is made must be accepted as true, and that such affidavits to be sufficient need not necessarily be composed wholly of strictly evidentiary facts. [Citation.]" (See also *Gardner* v. *Jonathan Club* (1950), 35 Cal.2d 343, 347 [217 P.2d 961] ; *Hardy* v. *Hardy* (1943), 23 Cal.2d 244, 245 [143 P.2d 701] ; *Walsh* v. *Walsh* (1941), 18 Cal.2d 439, 441 [116 P.2d 62].) ■ A summary judgment is proper only if the affidavits in support of the moving party "would be sufficient to sustain judgment in his favor, and . . . [his

opponent] does not 'by affidavit or affidavits . . . show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue of fact.' [Citations.]'' (*Coyne* v. *Krempels* (1950), 36 Cal.2d 257, 261 [223 P.2d 244].) In other words, the affidavits are to be construed with all intendments in favor of the party opposing the motion— here, plaintiff.

*The Facts upon Which the Claim of Contract is Based.* Construed agreeably to the rules above stated, it appears from the present record that defendant Wilder at the times here involved was employed by defendant Paramount Pictures Corporation (sometimes hereinafter referred to as Paramount) either as a writer, producer or director, or a combination of the three. In November, 1949, plaintiff telephoned Wilder's office. Wilder's secretary, who was also employed by Paramount, answered, and plaintiff stated that he wished to see Wilder. At the secretary's insistence that plaintiff explain his purpose, plaintiff ''told her about this fantastic unusual story. . . . I described to her the story in a few words. . . . I told her that it was the life story of Floyd Collins who was trapped and made sensational news for two weeks . . . and I told her the plot. . . . I described to her the entrapment and the death, in ten minutes, probably. She seemed very much interested and she liked it. . . . The main emphasis was the central idea, which was the entrapment, this boy who was trapped in a cave eighty-some feet deep. I also told her the picture had never been made with a cave background before.'' Plaintiff sought to send Wilder a copy of the story but when the secretary learned of its length of some 65 pages she stated that Wilder would not read it, that he wanted stories in synopsis form, that the story would first be sent to the script department, and ''in case they think it is fantastic and wonderful, they will abbreviate it and condense it in about three or four pages, and the producers and directors get to see it.'' Plaintiff protested that he preferred to do the abbreviating of the story himself, and the secretary suggested that he do so. Two days later plaintiff, after preparing a three or four page outline of the story, telephoned Wilder's office a second time and told the secretary the synopsis was ready. The secretary requested plaintiff to read the synopsis to her over the telephone so that she could take it down in shorthand, and plaintiff did so. During the conversation the secretary told plaintiff that the story seemed interesting and that she liked it. ''She said

that she would talk it over with Billy Wilder and she would let me know." Plaintiff on his part told the secretary that defendants could use the story only if they paid him "the reasonable value of it . . . I made it clear to her that I wrote the story and that I wanted to sell it. . . . I naturally mentioned again that this story was my story which has taken me so much effort and research and time, and therefore if anybody used it they will have to pay for it . . . She said that if Billy Wilder of Paramount uses the story, 'naturally we will pay you for it.' " Plaintiff did not remember whether in his first telephone conversation with the secretary anything was said concerning his purpose of selling the story to defendants.[4] He did not at any time speak with defendant Wilder. It seems clear, however, that one of the authorized functions of the secretary was to receive and deliver messages to Wilder and hence, as is developed *infra,* that on this record her knowledge would be his knowledge. Plaintiff's only subsequent contact with the secretary was a telephone call to her in July, 1950, to protest the alleged use of his composition and idea in a photoplay produced and exhibited by defendants. The photoplay, as hereinafter shown in some detail, closely parallels both plaintiff's synopsis and the historical material concerning the life and death of Floyd Collins. It also includes a fictional incident which appears in plaintiff's synopsis and which he claims is his creation, presumably in the sense of being both original and novel in its combination with the facts from the public commons[5] or public domain.

---

[4] Although defendants in their answer deny submission of plaintiff's story, nevertheless defendants state that for purposes of the motion for summary judgment they "are assuming that plaintiff did make a submission to defendants in accordance with his testimony in his deposition. At the trial of the action the purported fact of such submission would be contested, but to simplify the issues it is not contested in the making of this motion."

[5] The term "public commons" is used and defined by Mr. William B. Carman of the Los Angeles Bar (of counsel for defendants) in a paper appearing in 42 Cal.L.Rev. 52, 59. Mr. Carman says, "I have used the words 'public commons' to describe . . . elements which can under no circumstances constitute private property, and avoided the more usual 'public domain,' because the latter phrase leads to confusion. 'Public domain' of course includes these elements, but it includes also any pre-existing published works which were not initially protected by statutory copyright, or on which such protection has expired; in fact this is its usual technical meaning. Such works are freely open for use by either plaintiff or defendant, but it is not the law that plaintiff's claim of a property interest is inevitably defeated by the prior existence of similar material in works in the 'public domain.' " For the purposes of this opinion it is, however, unnecessary to observe the distinction suggested by Mr. Carman.

*The Contentions of the Parties and Amici Curiae.* In his opening brief plaintiff states "It is conceded *for purposes of argument* [italics added] that the synopsis submitted by plaintiff to defendants was not sufficiently unique or original to be the basis for recovery under the law of plagiarism or infringement. It is conceded that the plaintiff first obtained the central idea or theme of his story, which involves the entrapment of a man in an underground cave and the national interest promoted by the attempt to rescue him, from the Floyd Collins incident which occurred in the 1920's.

"It is appellant's [plaintiff's] contention, however, that in spite of this, the lower court committed reversible error in granting a summary judgment in this case for the reason that the summary judgment had the effect of denying the plaintiff the right to prove that his idea or synopsis was the subject of a contract wherein the defendants promised to pay him for it if they used it. It is clear that 'ideas,' as such, may still be the subject of a contract in California and may be protected, as such, even though not protectible under the laws of plagiarism."

Plaintiff also asserts that he "is not suing defendants for plagiarizing his idea but is suing defendants because they agreed to pay him the reasonable value of the use of his idea and story synopsis if they used his idea" and that "defendants so used plaintiff's idea and synopsis but refused to pay him as they agreed." But the complaint, as already shown, alleges that "Plaintiff conceived, originated and completed [and offered for sale to and defendants accepted submission of and thereafter used] a certain untitled literary and dramatic composition (hereinafter called 'Plaintiff's Property') based upon the life of Floyd Collins.".

If plaintiff is seeking to recover for a mere abstract, unprotectible idea, he must meet certain rules; if he seeks recovery for a literary composition in which he conceivably had a property right, the rules are quite different, as will subsequently be shown.

It may be that plaintiff's concessions and arguments, in the light of the pleadings and evidence, are intended to suggest that there is some nebulous middle area between an abstract idea and a literary composition, wherein the idea has been cast in "concrete" form but not "concrete" enough to constitute a literary property. (See generally, Melville B. Nimmer of the Los Angeles Bar, writing in 27 So.Cal.L.Rev. 140-144, and cases cited.) However, for the purposes of this

case at least, we find it unnecessary and undesirable to recognize any such hybrid, although we are aware that the Supreme Court of the United States has spoken of a "quasi property" right in news gathered and disseminated by a news service agency. (See *International News Service* v. *Associated Press* (1918), 248 U. S. 215, 242 [39 S.Ct. 68, 73, 63 L.Ed. 211, 221, 222, 2 A.L.R. 293].) The plaintiff here, we conclude, must stand or fall, and this case will be resolved, on rules applicable to ideas on the one hand or literary property on the other.

[4] This court, of course, is not bound to accept concessions of parties as establishing the law applicable to a case. (*Bradley* v. *Clark* (1901), 133 Cal. 196, 209-210 [65 P. 395]; *Berniker* v. *Berniker* (1947), 30 Cal.2d 439, 449 [182 P.2d 557].) It is also to be noted that plaintiff's concession is qualified by the words "for purposes of argument." Hence, although plaintiff makes it clear that he is not suing for "plagiarism or infringement," we feel constrained to the view that in the light of the entire record we cannot disregard a possible property right interest in the literary composition *as a subject of contract*, express or implied, which could afford a basis for recovery.

Defendants concede, as they must, that "the act of disclosing an unprotectible idea, if that act is in fact the bargained-for exchange for a promise, may be consideration to support the promise." They then add, "But once the idea is disclosed without the protection of a contract, the law says that anyone is free to use it. Therefore, subsequent use of the idea cannot constitute consideration so as to support a promise to pay for such use." And as to the effect of the evidence defendants argue that plaintiff "disclosed his material before . . . [defendants] did or could do anything to indicate their willingness or unwillingness to pay for the disclosure. The act of using the idea, from which appellant attempts to imply a promise to pay, came long after the disclosure . . . Accordingly, even if a promise to pay could be found . . . it came after the disclosure had been made and is therefore unenforceable." The conclusion of law asserted in the last sentence, insofar as it might be applicable to an express (whether proved by direct or by circumstantial evidence) promise to pay for the service (the conveyance of the idea) previously rendered from which a profit has been derived, for reasons which hereinafter appear (*infra*, pp. 803-804), is not tenable.

Relative to the subject of inferred or implied contractual liability, amici curiae Association of Motion Picture Producers, Inc., National Broadcasting Company, Inc., and Four Star Films, Inc., are concerned with the state of the law. They fear that what they conceive to be quasi contractual situations, wherein the law equitably but fictionally presumes of one the making of a promise which he not only did not make but never intended to make, will be confused with circumstances which evidence actual meeting-of-the-minds but unspoken contracts; i. e., what they appear to consider to be properly termed implied-in-fact contracts. ▮ They caution us that in a situation such as this, "One party cannot, by unilateral words or deeds, thrust upon another a contractual relationship unless the latter has, *by his own words or deeds,* consented thereto" and that "In the absence of manifest assent to the same thing upon the same terms *by both parties,* there is no contract." With the first of these cautionary propositions we unqualifiedly agree. Our agreement with the second, as will hereinafter appear, must depend on what it meant by "manifest assent." ▮ We do not agree with the further proposition, asserted or implied by defendants and their related amici, that an idea which before conveyance has sufficient value to constitute consideration for a promise to pay its reasonable value necessarily and *ipso facto* upon disclosure becomes devoid of value so that as a matter of law it cannot support a promise then—and only then—made to pay its reasonable value. A promise, made in advance of disclosure, to pay for the act of conveyance or disclosure of an idea which may or may not have value is one thing. A promise, made after conveyance of the idea to the promisor, to pay reasonable value for an idea which does have value to the promisor and which has been conveyed to, and has been used by, him is another contract, the possible enforceability of which is discussed *infra* at pages 803-804.

From what has been indicated above it appears necessary for us in the proper disposition of this case, having in mind the problems which apparently will confront the trial court at a trial on the merits and the duty imposed on us by section 53 of the Code of Civil Procedure, to consider not only (1) the rules for recovery pertaining to the conveyance of ideas, as such, but also (2) the question whether the synopsis of plaintiff's untitled composition could on any view of the evidence be deemed entitled to the status of a literary property, and (3) the rules defining rights of recovery, so far

as pertinent on this record, if plaintiff has a literary property in his composition.

*The Law Pertaining to Ideas.* ■ Generally speaking, ideas are as free as the air and as speech and the senses, and as potent or weak, interesting or drab, as the experiences, philosophies, vocabularies, and other variables of speaker and listener may combine to produce, to portray, or to comprehend. But there can be circumstances when neither air nor ideas may be acquired without cost. The diver who goes deep in the sea, even as the pilot who ascends high in the troposphere, knows full well that for life itself he, or someone on his behalf, must arrange for air (or its respiration-essential element, oxygen) to be specially provided at the time and place of need. The theatrical producer likewise may be dependent for his business life on the procurement of ideas from other persons as well as the dressing up and portrayal of his self-conceptions; he may not find his own sufficient for survival. ■ As counsel for the Writers Guild aptly say, ideas ''are not freely usable by the entertainment media until the latter are made aware of them.'' The producer may think up the idea himself, dress it and portray it; or he may purchase either the conveyance of the idea alone or a manuscript embodying the idea in the author's concept of a literary vehicle giving it form, adaptation and expression. It cannot be doubted that some ideas are of value to a producer.

■ An idea is usually not regarded as property, because all sentient beings may conceive and evolve ideas throughout the gamut of their powers of cerebration and because our concept of property implies something which may be owned and possessed to the exclusion of all other persons. ■ We quote as an accurate statement of the law in this respect the following language of Mr. Justice Brandeis, dissenting in *International News Service* v. *Associated Press* (1918), *supra,* 248 U. S. 215, 250 [39 S.Ct. 68, 76, 63 L.Ed. 211, 225]: ''An essential element of individual property is the legal right to exclude others from enjoying it. If the property is private, the right of exclusion may be absolute; if the property is affected with a public interest, the right of exclusion is qualified. ■ But the fact that a product of the mind has cost its producer money and labor, and has a value for which others are willing to pay, is not sufficient to ensure to it this legal attribute of property. The general rule of law is, that the noblest of human productions—knowledge, truths ascertained, conceptions, and ideas—become, after vol-

untary communication to others, free as the air to common use."[6] ██ Of similar import, but stated negatively: "The doctrine that an author has a property right in his ideas and is entitled to demand for them the same protection which the law accords to the proprietor of personal property generally finds no recognition either in the common law or in the statutes of any civilized country." (34 Am.Jur. 402-403, § 5; 18 C.J.S. 143, § 10e; cf. *Golding* v. *R.K.O. Pictures, Inc.* (1950), 35 Cal.2d 690, 693-697, 702, 711-712 [221 P.2d 95]; *Burtis* v. *Universal Pictures Co., Inc.* (1953), 40 Cal.2d 823, 831 [256 P.2d 933]; *Kurlan* v. *Columbia Broadcasting System* (1953), 40 Cal.2d 799 [256 P.2d 962].) ██ Whether the theory upon which this court sustained recovery in the Golding case may properly be classed as a property rights theory is not clear (see pp. 694-695 of 35 Cal.2d and pp. 831, 836-837 of 40 Cal.2d) but it is clear that California does not now accord individual property type protection to abstract ideas. (*Weitzenkorn* v. *Lesser*[7] (1953), 40 Cal.2d 778, 788-789 [256 P.2d 947].) This accords with the general weight of authority. (See generally, Nimmer, *"The Law of Ideas,"* (1954) 27 So. Cal.L.Rev. 120 et seq. and cases cited.) ██ "There may be literary property in a particular combination of ideas [and this must presuppose an expression thereof] or in the form in which ideas are embodied. There can be none in the 'ideas." (*Fendler* v. *Morosco* (1930), 253 N. Y. 281, 287 [171 N.E. 56, 58].) ██ Neither common law nor statutory copyright extends protection to an idea as such. "[O]nly

---

[6]The general rule as stated by Justice Brandeis is not disputed in the majority opinion but the latter recognizes what is termed a "quasi property" right in news gathered by the respective competing agencies (see p. 73 of 39 S.Ct. [248 U. S. 215, 250, 63 L.Ed. 211, 225]) and resolves the case on theories applicable to unfair competition.

[7]For development of the current state of the law in California and the somewhat differing and evolving views of the justices see *Golding* v. *R.K.O. Pictures* (1949), *supra*, (Cal.) 208 P.2d 1, 7; *id.* on rehearing, 35 Cal.2d 690, 701, 710 [221 P.2d 95]; *Stanley* v. *Columbia Broadcasting System* (1949), (Cal.) 208 P.2d 9, 17; *id.* on rehearing, 35 Cal.2d 653, 668, 672 [221 P.2d 73, 23 A.L.R.2d 216]; *Weitzenkorn* v. *Lesser* (1953), *supra*, 40 Cal.2d 778, 795; *Kurlan* v. *Columbia Broadcasting System* (1953), *supra*, 40 Cal.2d 799, 811, 812, 815; *Burtis* v. *Universal Pictures Co., Inc.* (1953), *supra*, 40 Cal.2d 823, 835, 837.
It is to be noted that the opinion of Justice Edmonds in the Weitzenkorn case, sometimes referred to as the majority opinion, has the full concurrence of but two other justices (Chief Justice Gibson, and Justice Shenk), with a limited concurrence by Justice Schauer. Justices Traynor and Spence concur only in the judgment and Justice Carter dissents. However, any portions of the Weitzenkorn opinion quoted herein as holdings of the court, or cited with approval, are to be understood as now having the concurrence of a majority of the court.

in the 'expression' of a copyrighted work does any monopoly inhere; the 'theme,' the 'plot,' the 'ideas' may always be freely borrowed.'' (*Dellar* v. *Samuel Goldwyn, Inc.* (1945, 2d C.C.A.), 150 F.2d 612.)

The principles above stated do not, however, lead to the conclusion that ideas cannot be a subject of contract. As Mr. Justice Traynor stated in his dissenting opinion in *Stanley* v. *Columbia Broadcasting System* (1950), *supra,* 35 Cal.2d 653, 674: ''The policy that precludes protection of an abstract idea by copyright does not prevent its protection by contract. Even though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed. That disclosure may therefore be consideration for a promise to pay . . . Even though the idea disclosed may be 'widely known and generally understood' [citation], it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty.'' (*Cf. Brunner* v. *Stix, Baer & Fuller Co.* (1944), 352 Mo. 1225 [181 S.W.2d 643, 646] ; *Schonwald* v. *F. Burkart Mfg. Co.* (1947), 356 Mo. 435 [202 S.W.2d 7].) Amici supporting plaintiff add, ''If a studio wishes to have an idea disclosed to it and finds that idea of sufficient value to make use of it, it is difficult to see how any hardship is involved in requiring payment of the reasonable value of the material submitted.'' The principles enunciated in the above quotation from Justice Traynor's dissent are accepted as the law of California (*Weitzenkorn* v. *Lesser* (1953), *supra,* 40 Cal.2d 778, 791-792) and we have no quarrel with amici's postulation. This case, however, remains to be resolved.

The lawyer or doctor who applies specialized knowledge to a state of facts and gives advice for a fee is selling and conveying an idea. In doing that he is rendering a service. The lawyer and doctor have no property rights in their ideas, as such, but they do not ordinarily convey them without solicitation by client or patient. Usually the parties will expressly contract for the performance of and payment for such services, but, in the absence of an express contract, when the service is requested and rendered the law does not hesitate to infer or imply a promise to compensate for it. (See *Buck* v. *City of Eureka* (1899), 124 Cal. 61, 66 [56 P. 612] ; *Zumwalt* v. *Schwarz* (1931), 112 Cal.App. 734, 736 [297 P. 608] ; *People's Nat. Bank* v. *Geisthardt* (1898), 55 Neb. 232, 237-238 [75 N.W. 582] ; 6 Cal.Jur.2d 378, § 181;

734

5 Am.Jur. 351, § 153; 41 Am.Jur. 256, § 142; 7 C.J.S. 1078, § 190(b); 70 C.J.S. 1023, § 68; see also *Long* v. *Rumsey* (1938), 12 Cal.2d 334, 341-342 [84 P.2d 146].) In other words the recovery may be based on contract either express or implied. The person who can and does convey a valuable idea to a producer who commercially solicits the service or who voluntarily accepts it knowing that it is tendered for a price should likewise be entitled to recover. In so holding we do not fail to recognize that free-lance writers are not necessarily members of a learned profession and as such bound to the exalted standards to which doctors and lawyers are dedicated. So too we are not oblivious of the hazards with which producers of the class represented here by defendants and their related amici are confronted through the unsolicited submission of numerous scripts on public domain materials in which public materials the producers through their own initiative may well find nuclei for legitimately developing the "stupendous and colossal." The law, however, is dedicated to the proposition that for every wrong there is a remedy (Civ. Code, § 3523) and for the sake of protecting one party it must not close the forum to the other. It will hear both and seek to judge the cause by standards fair to both. To that end the law of implied contracts assumes particular importance in literary idea and property controversies.

*The Law Pertaining to Contracts, Express, Implied-in-Fact and Implied by Law, and Quasi Contractual Obligations, as Related to Ideas and Literary Property.* The parties and amici, from their several viewpoints, discuss the law of contracts and caution us not to confuse the rules insofar as such rules may differentiate respectively among contracts which are express or implied-in-fact or implied-in-law, meaning by the latter expression to denote a quasi-contractual obliлation imposed by law. We agree that whether a contract be properly identified as express or as implied-in-fact or inferred from circumstances; or whether the bargain meets the subjective test of a meeting of minds or is held to reside in the objective evidence of words and acts with or without a meeting of minds; or whether the obligation be recognized as implied by law from acts having consensual aspects (and therefore often termed implied-in-fact); or whether the obligation be imposed by law because of acts and intents which, although tortious rather than consensual, should in justice give rise to an obligation resembling that created by contract

and, hence, should be termed quasi-contractual, is important here to the extent that we recognize the situations and discriminate appropriately in the governing rules.

An eminent writer says that ''The elements requisite for an informal contract . . . are identical whether they are expressly stated or implied in fact,'' citing e. g., *Lombard* v. *Rahilly* (1914), 127 Minn. 449 [149 N.W. 950], holding ''A 'contract implied in fact' requires a meeting of the minds, an agreement, just as much as an 'express contract'; the difference between the two being largely in the character of the evidence by which they are established''; see also *Silva* v. *Providence Hospital of Oakland* (1939), 14 Cal.2d 762, 773 [97 P.2d 798]. (Williston on Contracts, rev. ed., vol. 1, p. 8.) The same author describes quasi contracts by declaring that ''as quasi contractual obligations are imposed by the law for the purpose of bringing about justice without reference to the intention of the parties, the only apparent restriction upon the power of the law to create such obligations is that they must be of such a sort as would have been appropriately enforced under common-law procedure by a contractual action. Indeed even this limitation is too narrow, for a bill in equity or a libel in admiralty might be the appropriate means of enforcing some quasi contractual obligations. As the law may impose any obligations that justice requires, the only limit in the last analysis to the category of quasi contracts is that the obligation in question more closely resembles those created by contract than those created by tort. On the other hand, a true contract cannot exist, however desirable it might be to have one, unless there is a manifestation of assent to the making of a promise. Furthermore, the measure of damages appropriate to contractual obligations differs from that applicable to quasi contracts . . . It is also true that quasi contractual obligations are not so universally based on unjust enrichment or benefit as is sometimes supposed.[8] There are many cases where the law enforces in a contractual action a duty to restore the plaintiff to a former status—not merely to surrender the benefit which the defendant has received.''

If it were not for precedent we should hesitate to speak of an implied-in-fact contract. In truth, contracts are

---

[8] The doctrine of unjust enrichment is regarded as usually underlying recovery in quasi contractual situations. (See *Matarese* v. *Moore-McCormack Lines* (1946, C.C.A.2d), 158 F.2d 631, 634; *Stanley* v. *Columbia Broadcasting System* (1950), *supra*, 35 Cal.2d 653, 675, Traynor, J., dissenting.)

either made in fact or the obligation is implied in law. If made in fact, contracts may be established by direct evidence or they may be inferred from circumstantial evidence. The only difference is in the method of proof. In either case they would appear to be express contracts. Otherwise, it would seem that they, or the presumed contractual obligation, must be implied at law. A so-called "implied-in-fact" contract, however, as the term is used by some writers, may be found although there has been no meeting of the minds. Even an express contract may be found where there has been no meeting of minds. The classic example of this situation is set up by the parol evidence rule. The law accepts the objective evidence of the written contract as constituting the contract and, subject, of course, to certain exceptions, precludes oral evidence to show that the minds of the parties did not meet in the writing. Professor Williston recognizes in effect, if not specifically, that the law implies (or construes) contractual obligations in many cases where there is no true contract in the historically conventional sense and that such implied obligations are of the nature of, and governed by the rules applicable to, contracts termed implied-in-fact by many writers. In a paper published in 14 Illinois Law Review 85, 90, Mr. Williston says: "The parties may be bound by the terms of an offer even though the offeree expressly indicated dissent, provided his action could only lawfully mean assent. A buyer who goes into a shop and asks and is given [told] the price of an article, cannot take it and say 'I decline to pay the price you ask, but will take it at its fair value.' He will be liable, if the seller elects to hold him so liable, not simply as a converter for the fair value of the property, but as a buyer for the stated price." (See *Lucy* v. *Mouflet* (1860), 5 H. & N. 229, 232; *Wilcox, Ives & Co.* v. *Rogers* (1913), 13 Ga.App. 410 [79 S.E. 219]; Rest., Contracts, § 5, p. 7; § 72(2), p. 77.) Concerning the same subject Professor Costigan, in a paper published in 33 Harvard Law Review 376, at 398, states his view: "Professor Williston is absolutely right in his contention that the no-meeting-of-the-minds express contracts—the objective but not subjective test contracts—are properly to be denominated contracts instead of quasi-contracts, and the reason for that concession was that on their breach the normal contract measure of damages is applied. But that same reason has led us to the further conclusion that there are genuine implied-

in-fact contracts of both the meeting-of-the-minds and the no-meeting-of-the-minds varieties.''

Whether the resulting ''contract'' in the cases discussed by the learned professors is classified as express (as may be fictionized by the law's objective test) or as implied-in-fact (as also may be fictionized by the law) or whether in the same or slightly differing circumstances an obligation shall be ''implied'' and denominated ''quasi contractual'' because it is strong-armed by the law from nonconsensual acts and intents, is probably important in California—and for the purposes of resolving the problems now before us—principally as an aid to understanding the significance of rulings and discussions in authorities from other jurisdictions. Here, our terminology and the situations for application of the pertinent rules are simplified by codification.

Our Civil Code declares that (§ 1619) ''A contract is either express or implied''; (§ 1620) ''An express contract is one, the terms of which are stated in words'' and (§ 1621) ''An implied contract is one, the existence and terms of which are manifested by conduct.'' The same code further provides that (§ 1584) ''[T]he acceptance of the consideration offered with a proposal, is an acceptance of the proposal''; (§ 1589) ''A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the persons accepting''; (§ 1605) ''Any benefit conferred . . . upon the promisor, by any other person, to which the promisor is not lawfully entitled . . . is a good consideration for a promise''; and (§ 1606) ''[A] moral obligation originating in some benefit conferred upon the promisor . . . is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise.'' (See also *Silva* v. *Providence Hospital of Oakland* (1939), *supra,* 14 Cal.2d 762, 773, and cases there cited; *Horacek* v. *Smith* (1948), 33 Cal.2d 186, 194 [11] [199 P.2d 929]; *Yadkoe* v. *Fields* (1944), 66 Cal.App.2d 150, 158-159 [151 P.2d 906]; Rest., Contracts, §§ 5, 72(2); 12 Cal.Jur.2d 186-189.)

From what has been shown respecting the law of ideas and of contracts we conclude that conveyance of an idea can constitute valuable consideration and can be bargained for before it is disclosed to the proposed purchaser, but once it is conveyed, i. e., disclosed to him and he has

738

grasped it, it is henceforth his own and he may work with it and use it as he sees fit. ■■■ In the field of entertainment the producer may properly and validly agree that he will pay for the service of conveying to him ideas which are valuable and which he can put to profitable use. ■■■ Furthermore, where an idea has been conveyed with the expectation by the purveyor that compensation will be paid if the idea is used, there is no reason why the producer who has been the beneficiary of the conveyance of such an idea, and who finds it valuable and is profiting by it, may not then for the first time, although he is not at that time under any legal obligation so to do, promise to pay a reasonable compensation for that idea—that is, for the past service of furnishing it to him—and thus create a valid obligation. ■■■ As said in 12 American Jurisprudence 603, section 110, "there is considerable authority which supports the view that the moral obligation arising from a benefit of a material or pecuniary kind conferred upon the promisor by past services, rendered in the expectation that they were to be paid for—or, at least, if rendered upon the assumption by the person rendering them, though mistaken, that they would create a real liability —and, otherwise, in circumstances creating a moral obligation on the part of the promisor to pay for the same, will support an executory promise to do so, although there was, previous to such promise, no legal liability or promise, perfect or imperfect." (See also Civ. Code, §§ 1605, 1606, quoted *supra*, p. 802; *Edson* v. *Poppe* (1910), 24 S.D. 466 [124 N.W. 441, 26 L.R.A.N.S. 534]; *Bailey* v. *City of Philadelphia* (1895), 167 Pa. 569 [31 A. 925, 46 Am.St.Rep. 691]; *Gray* v. *Hamil* (1889), 82 Ga. 375 [10 S.E. 205, 6 L.R.A. 72]; *Credit Bureau of San Diego* v. *Johnson* (1943), 61 Cal.App.2d Supp. 834, 839 [142 P.2d 963]; 17 A.L.R. 1366-1371, s. 79 A.L.R. 1354; 53 L.R.A. 371-376; 26 L.R.A.N.S. 526.) ■■■ But, assuming legality of consideration, the idea purveyor cannot prevail in an action to recover compensation for an abstract idea unless (a) before or after disclosure he has obtained an express promise to pay, or (b) the circumstances preceding and attending disclosure, together with the conduct of the offeree acting with knowledge of the circumstances, show a promise of the type usually referred to as "implied" or "implied-in-fact."[9] (See *Weitzenkorn* v. *Lesser* (1953), *su-*

---

[9] Such "implied" or "implied-in-fact" contracts are, we think, more accurately described as express contracts proved by circumstantial evidence.

*pra,* 40 Cal.2d 778, 794-795; *Elfenbein* v. *Luckenbach Terminals* (1933), 111 N.J.L. 67 [166 A. 91, 93].) ▮ That is, if the idea purveyor has clearly conditioned his offer to convey the idea upon an obligation to pay for it if it is used by the offeree and the offeree, knowing the condition before he knows the idea, voluntarily accepts its disclosure (necessarily on the specified basis) and finds it valuable and uses it, the law will either apply the objective test (discussed, *supra,* pp. 801-802) and hold that the parties have made an express (sometimes called implied-in-fact) contract, or under those circumstances, as some writers view it, the law itself, to prevent fraud and unjust enrichment, will imply a promise to compensate.

▮ Such inferred or implied promise, if it is to be found at all, must be based on circumstances which were known to the producer at and preceding the time of disclosure of the idea to him and he must voluntarily accept the disclosure, knowing the conditions on which it is tendered. ▮ Section 1584 of the Civil Code ("[T]he acceptance of the consideration offered with a proposal, is an acceptance of the proposal") can have no application unless the offeree has an opportunity to reject the consideration—the proffered conveyance of the idea—before it is conveyed. Unless the offeree has opportunity to reject he cannot be said to accept. (*Cf. People* v. *Forbath* (1935), 5 Cal.App.2d Supp. 767, 769-770 [42 P.2d 108]; *County of Ventura* v. *Southern Calif. Edison Co.* (1948), 85 Cal.App.2d 529, 532 [193 P.2d 512]; *Krum* v. *Malloy* (1943), 22 Cal.2d 132, 135 [137 P.2d 18].) The idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power. ▮ The law will not in any event, from demands stated subsequent to the unconditioned disclosure of an abstract idea, imply a promise to pay for the idea, for its use, or for its previous disclosure. ▮ The law will not imply a promise to pay for an idea from the mere facts that the idea has been conveyed, is valuable, and has been used for profit; this is true even though the conveyance has been made with the hope or expectation that some obligation will ensue. So, if the plaintiff here is claiming only for the conveyance of the idea of making a dramatic production out of the life of Floyd Collins he must fail unless in conformity with the above stated rules he can establish a contract to pay.

▮ From plaintiff's testimony, as epitomized above (pp.

791-793), it does not appear that a contract to pay for conveyance of the abstract photoplay idea had been made, or that the basis for inferring such a contract from subsequent related acts of the defendants had been established, at the time plaintiff disclosed his basic idea to the secretary. Defendants, consequently, were at that time and from then on free to use the abstract idea if they saw fit to engage in the necessary research and develop it to the point of a usable script. Whether defendants did that, or whether they actually accepted and used plaintiff's synopsis, is another question. And whether by accepting plaintiff's synopsis and using it, if they did accept and use it, they may be found to have implicitly— by the rules discussed *supra*, pages 798-802—agreed to pay for whatever value the synopsis possessed as a composition embodying, adapting and implementing the idea, is also a question which, upon the present summary judgment record, is pertinent for consideration in reaching our ultimate conclusion. That is, if the evidence suggests that defendants accepted plaintiff's synopsis, did they not necessarily accept it upon the terms on which he had offered it? Certainly the mere fact that the idea had been disclosed under the circumstances shown here would not preclude the finding of an implied (inferred in fact) contract to pay for the synopsis embodying, implementing and adapting the idea for photoplay production.

*The Law Pertaining to Literary Property.* ▋ "Literary property" is a general term which is used either to describe the interest of an author (or those who claim under him) in his works (whether before or after publication or before or after copyright has been secured) or to denote the corporeal property in which an intellectual production is embodied. (Bouvier's Law Dict. (1940), p. 731; 34 Am.Jur. 400, § 2; 18 C.J.S. 139, § 3.) ▋ Literary property in an intellectual production is afforded protection by the common law (*Werckmeister* v. *American Lithograph Co.* (1904, C.C.A. 2d), 134 F. 321, 68 L.R.A. 591; see also 34 Am.Jur. 405-406, § 8), by federal statute pursuant to constitutional authorization (see U. S. Const., art. I, § 8; see also title 17, U. S. Code; *Bobbs-Merrill Co.* v. *Straus* (1908), 210 U. S. 339, 346 [28 S.Ct. 722, 52 L.Ed. 1086]), and by state law (Cal. Civ. Code, § 980).

▋ The basic distinction between the rights in and to literary productions as they may exist at common law and as they are granted by statutory copyright is that the common

law protects only a property right while the copyright statute grants a limited monopolistic privilege. (34 Am.Jur. 401, § 2.) Plaintiff here has no statutory copyright. His claim as to the synopsis, therefore, necessarily must rest in a common law property right or in contract. He has chosen to rest it in contract. If plaintiff has a literary composition it may be the subject of a property right and its use by defendants, if established, could entitle him to remedies, notwithstanding the concessions he has made, which would be unavailable if he had only an idea to be appropriated or to be the subject of contract.

 Literary property which is protectible may be created out of unprotectible material such as historical events. It has been said (and does not appear to have been successfully challenged) that "There are only thirty-six fundamental dramatic situations, various facets of which form the basis of all human drama." (Georges Polti, "The Thirty-Six Dramatic Situations"; see also Henry Albert Phillips, "The Universal Plot Catalog"; Eric Heath, "Story Plotting Simplified.") It is manifest that authors must work with and from ideas or themes which basically are in the public domain. History both in broadly significant and in very personal aspects has furnished a wealth of material for photoplays. The Crusades, The French Revolution, The War Between the States, the lives, or events from the lives, of rulers, ministers, doctors, lawyers, politicians, and military men, among others, all have contributed. Events from the life of the late General William Mitchell are even now the basic theme of a current showing. Events from the life of Floyd Collins were avowedly the basic theme of plaintiff's story. Certainly, it must be recognized that a literary composition does not depend upon novelty of plot or theme for the status of "property," if it is entitled to that status at all. The terms "originality" and "novelty" have often been confused, or used without differentiation, or with meanings which vary with different authorities. We therefore suggest the sense in which we use them. A literary composition may be original, at least in a subjective sense, without being novel. To be original it must be a creation or construction of the author, not a mere copy of another's work. The author, of course, must almost inevitably work from old materials, from known themes or plots or historical events, because, except as knowledge unfolds and history takes place, there is nothing new with which to work. But "Creation, in its technical

sense, is not essential to vest one with ownership of rights in intellectual property. Thus, a compiler who merely gathers and arranges, in some concrete form, materials which are open and accessible to all who have the mind to work with like diligence is as much the owner of the result of his labors as if his work were a creation rather than a construction." (34 Am.Jur. 409, § 12; see also 23 A.L.R.2d 265; Amdur on Copyrights, 69-70, § 3; *Fred Fisher, Inc.* v. *Dillingham* (1924), 298 F. 145, 150-161; *Jewelers' Mercantile Agency* v. *Jewelers' Weekly Pub. Co.* (1898), 155 N. Y. 241 [49 N.E. 872, 41 L.R.A. 846, 63 Am.St.Rep. 666]; *Booth & Hanford Abstract Co.* v. *Phelps* (1894), 8 Wash. 549 [36 P. 489, 23 L.R.A. 864, 40 Am.St.Rep. 921]; *Leon Loan & Abstract Co.* v. *Equalization Board* (1892), 86 Iowa 127 [53 N.W. 94, 17 L.R.A. 199, 41 Am.St.Rep. 486]; *Dart* v. *Woodhouse* (1879), 40 Mich. 399 [29 Am.Rep. 544].)

Writing — portraying characters and events and emotions with words, no less than with brush and oils—may be an art which expresses personality. Accordingly, the language of Mr. Justice Holmes, speaking for the Supreme Court in a copyright case relating to circus posters is apropos: "Others are free to copy the original. They are not free to copy the copy . . . The copy is the personal reaction of an individual upon nature. Personality always contains something unique. It expresses singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone. That something he may copyright unless there is a restriction in the words of the act." (*Bleistein* v. *Donaldson Lithographing Co.* (1903), 188 U.S. 239, 249-250 [23 S.Ct. 298, 47 L.Ed. 460].) As indicated, the theme of a writer must almost inevitably be neither novel nor original. The finished work probably will not be novel because it deals only with the public domain or public commons facts. But the completed composition may well be the original product of the researcher who compiles or constructs it. He gives it genesis, and genesis in this sense requires only origin of the composition, not of the theme. The composition will be the property of the author. Whether it possesses substantial value, and to what extent, if any, it may be entitled to copyright protectibility, may be quite another matter.

The time of the author; his resourcefulness in, opportunity for and extent of, research; his penetration in perception and interpretation of source materials; the acumen of his axiological appraisals of the dramatic; and his skill and

style of composition, including the art of so portraying accurate narration of events long past as to arouse vivid emotions of the present, are all elements which may contribute to the value of his product. Some of those elements in varying quanta and proportions must exist in any literary composition; thereby the composition reflects the personality of the author. And any literary composition, conceivably, may possess value in someone's estimation and be the subject of contract, or, conversely, it may be considered totally devoid of artistic, historic, scientific or any practical value. Obviously the defendants here used someone's script in preparing and producing their photoplay. That script must have had value to them. As will be hereinafter shown, it closely resembles plaintiff's synopsis. Ergo, plaintiff's synopsis appears to be a valuable literary composition. Defendants had an unassailable right to have their own employes conduct the research into the Floyd Collins tragedy—an historical event in the public domain—and prepare a story based on those facts and to translate it into a script for the play. But equally unassailable (assuming the verity of the facts which plaintiff asserts) is plaintiff's position that defendants had no right—except by purchase on the terms he offered—to acquire and use the synopsis prepared by him.

 The proposition which seems to be implicit in some of the contentions of defendants and their related amici—that a producer, to whom a literary composition or idea is offered for sale for its reasonable value if used, may state that he will not agree to purchase the proffered literary composition, or idea for one, until he knows what the composition or idea is, may then, when it is submitted to him on those terms, consider it and say, in words or by his acts, "Yes, it is indeed valuable and I shall use it but I will not pay you for it because now I have it"—does not commend itself to us. If a producer is not commercially soliciting, and is not willing to accept an obligation to pay for, valuable ideas, or for compositions adapting and implementing them, which ideas and compositions are offered to be conveyed only upon the assumption of such an obligation, he does not need to read manuscripts which he knows are submitted on those terms, or to have his secretary take dictated synopses of stories offered on those conditions, and then use them. (See *Elfenbein* v. *Luckenbach Terminals*, (1933), *supra*, 111 N.J.L. 67 [166 A. 91, 93]; *cf. Matarese* v. *Moore-McCormick Lines* (1946,

C.C.A. 2d), *supra,* 158 F.2d 631, 634.) We are satisfied that, for the purposes of this appeal, plaintiff's dictation to defendant Wilder's secretary of the synopsis of his composition, embodying the core of his idea and his concept of a desirable entertainment media adaptation of it, is equivalent to submission of the synopsis in typed form.

Under the principles of law which have been stated it appears that for plaintiff to prevail on this appeal the record must indicate either that the evidence favors plaintiff, or that there is a triable issue of fact, in respect to the following questions: Did plaintiff prepare a literary composition on the Floyd Collins tragedy? Did he submit the composition to the defendants for sale? Did the defendants, knowing that it was offered to them for sale, accept and use that composition or any part thereof? If so, what was the reasonable value of the composition?

It is not essential to recovery that plaintiff's story or synopsis possess the elements of copyright protectibility if the fact of consensual contract be found. (*Weitzenkorn v. Lesser* (1953), *supra,* 40 Cal.2d 778, 791-792.) Neither can we hold, on the state of the record, that plaintiff's synopsis is devoid of the elements necessary to give it some measure of such protectibility. While the trial court, or an appellate court on a sufficient record, may determine the specific extent of an author's property right in any particular work (*Nichols* v. *Universal Pictures Corp.* (1930, C.C.A.2d), 45 F.2d 119, 121-122) it is unnecessary on this appeal to define the limits more exactly than has already been done, *supra,* pages 806-808 (see also *infra,* pp. 814-815).

*The Law Applied to the Facts.* Here, as conceded by defendants for purposes of their summary judgment motion, plaintiff, in accordance with his testimony, submitted his synopsis to them through defendant Wilder's secretary and such submission included a declaration by both plaintiff and the secretary that defendants were to pay for his story if they used it. The mere fact that at the time of plaintiff's first telephone call to Wilder's office he described the central idea of the story to the secretary in response to her insistence that he explain the purpose of his call would not as a matter of law deprive plaintiff of the right to payment for the story as discussed by him and the secretary when he again spoke with her two days later and at her request read his synopsis to her, for her to take down in shorthand for de-

fendants' consideration; the two conversations appear to have been parts of a single transaction and must be construed as such. The affidavits submitted on behalf of defendants by Wilder and by an officer of Paramount to the effect that neither Wilder nor Wilder's secretary had authority to negotiate contracts for the purchase of scripts do not compel the conclusion as a matter of law that an implied (inferred) contract binding defendants to pay for plaintiff's story was not created if (as is hereinafter shown) the record discloses any substantial evidence indicating that defendants did accept and make use of plaintiff's composition.

Factually it would be inconsistent, and legally it would be untenable, for the defendant corporations to deny that Paramount's employes, Wilder and the secretary, had authority to negotiate contracts for the purchase of literary material and at the same time to permit them to act as agents for the procurement of material offered for sale, and to use the material so acquired while disavowing the authority of the agents. Certainly if the secretary had accepted from plaintiff any other item of merchandise, such, for example, as office supplies, which plaintiff left with her with the statement that he was offering them for sale and that if used by defendants plaintiff expected to be paid therefor, defendants' subsequent use of such property would be held to give rise to an inferred or so-called implied-in-fact promise on their part to make payment. As hereinabove shown (*supra*, p. 802), Civil Code, section 1589, provides: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." If the secretary had authority to receive and transmit messages to her employer—such as messages offering to sell a story embodying a writer's idea for a photoplay—and to take down in shorthand for transmission to her employer the script of a synopsis, she also necessarily had authority to receive and transmit the conditions and terms of the offer. Her knowledge of those terms and conditions is the knowledge of her employers. (Civ. Code, § 2332; *Chapman College* v. *Wagener* (1955), 45 Cal.2d 796, 802 [291 P.2d 445]; see also Civ. Code, § 3521: "He who takes the benefit must bear the burden.") On this issue the evidence would support a finding that plaintiff's synopsis reached defendants through the secretary, and that they are chargeable

with knowledge of the conditions on which the synopsis was offered.

With respect to whether defendants used plaintiff's composition, it may be first noted that defendants presented no affidavits in any way denying such use, but merely exhibited their photoplay to the court for purposes of comparison between plaintiff's synopsis and defendants' production. Defendants also produced extracts from a magazine and newspaper to which plaintiff had already freely testified in his deposition that he had referred in preparing his story. A script of the photoplay was, however, attached to plaintiff's complaint as an exhibit, and plaintiff has provided an outline comparing his synopsis[10] with defendants' scenario. De-

---

[10] *Plaintiff's Synopsis*: Plaintiff's synopsis of his story, submitted to defendant Wilder's secretary as related hereinabove, stated that the ''story deals with the sensational and tragic end of Floyd Collins who lost his life in a cave in Ky. in 1925 and held the whole nation in suspense. . . . Since 1925 to the beginning of World War II only the Lindbergh stories . . . have outdone the Collins story for sustained interest. F. Collins lived with his family in a cave region of Ky. . . . It was underneath his father's farm where F. C. discovered the great Crystal Cave in 1917. Collins was obsessed with cave exploration since his boyhood. He gained reputation for discovering many relics left by the Indians which he sold to the tourists . . . F. was very much in love with a girl named Alma . . . In the spring of 1918 the Crystal Cave was opened for commercial tourists trade . . . On January 30, 1925, F. was on his way to enter a narrow aperture, his last excursion into the cave land. In all his previous trips Floyd had learned to fear a huge egg-shaped boulder weighing approximately 100 lbs. which was held in place, sharp point downward, by a small wedge rock, for he knew it meant disaster if he should brush against it. The joy of his new discovery overcame his natural caution. The heavy heel of his new boots struck the rock wedge. Down it crashed with the speed of a lightning flash, falling across his left ankle and pinioning both legs, for his right leg had been doubled beneath the left. He was held prisoner . . . F's father . . . spread the alarm. Telephones were busy . . . and soon the whole countryside was aroused . . . The first reporter to reach F. was William Burke Miller . . . [who told Collins] 'The world is coming, old man,' . . . F. told the reporter of a horrifying dream he had had, and he feared the curse of the dead Indians for having disturbed their graves. [The idea of the dreams and fears of the trapped man with respect to a curse of dead Indians was fictional or original with plaintiff, rather than historical fact.] . . . Lieutenant Burdon from the Louisville Fire Department who was led to F. by . . . Miller, . . . said, 'There is only one way to save Collins without maiming him, and that is to sink a shaft to him.'

''A stream of machines and men was moving down the clay road . . . Opposition develops between the natives and the rescue crew. . . . An ugly situation was imminent.

''The Louisville Courier-Journal was bringing the F. C. sensational news every day on the front page. W. Burke Miller's acceptance of danger was instigated, by the lure of Pulitzer Prize which later was awarded to him. Cave City was rapidly taking on the appearance of a Klondike gold rush town. . . . Miller was the only reporter who saw

fendants in their brief have likewise outlined the story of their photoplay.[11]

In defendants' motion picture script the trapped man expresses a fear of the curse of dead Indians, as did Collins

---

F. He placed an elec. light bulb around F's neck and fed him. . . . [A] general contractor . . . brought an acetylene torch to burn away the rock that held F, but he never got a chance to use it. . . . Rumors spread around that it was all a hoax and a publicity scheme, and that Floyd had fallen victim of foul play. Doc Hazlett feared that by now pneumonia might set in as F. was growing weaker. . . . Special reporters . . . came . . . from all sections of the country. . . . Special trains stopped at Cave City to unload travelers and equipment. . . . Many people regarded the occasion as a picnic. . . . F's father resented feebly the behavior.

"The shaft was sinking steadily toward the cavern. F. lay dying. . . . Extremely suspicious accusations were made by some reporters in regard to the rescue of F. C. Gov. Field summoned the Board of Military Inquiry . . . [which] was also directed to run down a most unfortunate story dispatched by two reporters who considered the whole thing a giant publicity scheme and a hoax . . ." The story ends with Collins' death.

[11]*Defendants' Photoplay Scenario*: From material provided by plaintiff and defendants, it appears that the scenario of defendants' photoplay also commences with a mention of Collins, comparing him to "Lindbergh over the Atlantic," and referring to the year 1925, Kentucky, and "The guy pinned way down in the cave. One of the biggest stories that ever broke. Front page on every paper in the country for weeks." Defendants state in their brief that their photoplay "does not purport to be a biography of the life of Floyd Collins . . . Its characters, plot and development are wholly imaginative. Its theme is to portray what might have happened to a group of . . . fictional characters in 1950 if they had come into contact with a situation similar to the Floyd Collins incident of 1925."

According to defendants' description of their photoplay, the central character is Charles Tatum, a reporter for a newspaper in Albuquerque, New Mexico. Tatum had once been a big-time newspaper man, but is now down on his luck and looking for an opportunity to regain his former prominent position. While traveling through New Mexico he stops at a roadside stand and finds that Leo Minosa, one of the proprietors, has just been trapped in an old Indian cliff dwelling nearby. Tatum recognizes in this event a chance to create an incident similar to the Floyd Collins incident and to exploit it in his own selfish interest. Playing on the greed of the local sheriff and of the trapped man's wife, Tatum succeeds in getting the exclusive right to enter the cave and interview the victim, who expresses fear of "The Indian dead. They're all around here. This is a tomb . . . with mummies four hundred years old." Tatum contrives to prolong the rescue operation so as to increase public interest in the affair and thus increase the value of his exclusive accounts of the event. He builds the affair into a horrible carnival of cheap publicity, pandering to the morbid curiosity of the public. He exacts enormous fees for his exclusive stories of the entrapment and rescue operations and his two selfish, inhuman assistants (the sheriff and the wife) avidly grasp at the profit to be made from the big build-up. The only difficulty is that the rescue operation is prolonged too long and the trapped man dies. Tatum is left with the realization that his careless disregard of consequences has made him in effect a murderer. He falls out with the wife and sheriff and is himself killed.

in the fictional portion of plaintiff's synopsis. Other similarities between plaintiff's story and the scenario of defendants' picture are these:

| Defendants' Scenario | Plaintiff's Story |
|---|---|
| Cave where Minosa trapped was on property owned by him and father. | Cave where Collins trapped was underneath father's farm. |
| Minosa operated Indian Curio Shop. | Collins sold Indian relics to tourists. |
| Minosa cave open to tourist trade. | Crystal Cave open to tourist trade. |
| Minosa's difficulty in extricating himself from cave was due to large flat slab wedged against wall of his cell, which slanted across him, pinning him down. | Rock wedge fell across Collins' left ankle and pinioned both legs, holding him prisoner. |
| Minosa's father calls sheriff. | Collins' father spread alarm. |
| Tatum is first reporter to arrive; tells Minosa not to worry, as "They'll get you out." | Miller is first reporter to reach Collins, and tells him, "The world is coming, old man." |
| Tatum suggests setting up a drill on top of the mountain and going straight down; this is done. | Lt. Burdon says, "There is only one way to save Collins without maiming him, and that is to sink a shaft to him." |
| Local miners object that drilling is unnecessary. | Opposition develops between the natives and the rescue crew. |
| Tatum comments that the news story is "Big. As big as they come, I think. Maybe bigger than Floyd Collins," and refers to fact that reporter on Collins story received a Pulitzer Prize. | Collins story carried on front page of Louisville newspaper every day; Miller was later awarded Pulitzer Prize. |
| Carnival trucks are described, and persons operating concessions are shown; excursion train is referred to; rescue equipment assembled and public address system used. | Cave City took on appearance of Klondike gold rush town; special reporters came; special trains stopped to unload travelers and equipment; occasion regarded as picnic by many. |

| | |
|---|---|
| Minosa's father protests. | Collins' father resented the behavior. |
| Doctor diagnoses pneumonia. | Doc Hazlett fears pneumonia. |
| Tatum is only reporter who saw Minosa. | Miller is only reporter who saw Collins. |
| Other reporters are suspicious of the "whole set-up and criticized and complained about Tatum's control of the situation"; one threatened to "take this all the way to Santa Fe. To the Governor." | Some reporters make accusations expressing strong suspicions with respect to lack of good faith in rescue of Collins; governor summons Board of Military Inquiry; two reporters considered whole thing a giant publicity scheme and hoax. |
| Minosa dies. | Collins dies. |

For the purposes of appellate review of this summary judgment proceeding it is apparent from the comparisons above tabulated, and from the outlines which are set out in the margin, that a factual issue, rather than one of law, is presented as to whether defendants used plaintiff's synopsis or developed their production independently thereof. (See *Yadkoe* v. *Fields* (1944), *supra,* 66 Cal.App.2d 150, 159-160; *cf. Sutton* v. *Walt Disney Productions* (1953), 118 Cal.App.2d 598, 603 [258 P.2d 519].) Particularly does this appear true in view of the fact that plaintiff submitted his synopsis to defendants in November, 1949, and that as early as July, 1950, the latter were producing their photoplay which, despite their assertion that it "does not purport to be a biography of the life of Floyd Collins . . . Its characters, plot and development are wholly imaginative," obviously does bear a remarkable similarity to plaintiff's story both in respect to the historical data and the fictional material originated by plaintiff.

It has been suggested that this court view the photoplay (which defendants in their brief offer to make available) in order to determine whether a triable issue of fact exists. The scope of the implications in that suggestion is persuasive to us that the issues here are not for summary disposition. In the light of the conclusions we have reached on the evidence already discussed it appears that viewing the photoplay would relate merely to the weight of the evidence.

(See *Kurlan* v. *Columbia Broadcasting System* (1953), *supra,* 40 Cal.2d 799, 806-807.) We therefore find it unnecessary to view the film.

At the trial the trier of fact should proceed with nicety of discrimination in applying the evidence to resolve the issues. ▮ Inasmuch as plaintiff's story is taken from the public domain, and as both his story and that of defendants are in principal substance historically accurate, it must be borne in mind that the mere facts that plaintiff submitted and offered to sell to defendants a synopsis containing public domain material and that thereafter defendants used the same public domain material, will not support an inference that defendants promised to pay for either the synopsis or for the idea of using the public domain material. ▮ The plaintiff can have no property right in the public domain facts concerning Floyd Collins or in the abstract idea of making a photoplay dramatizing those facts. On the other hand, the fact that plaintiff used the public domain material in constructing his story and synopsis would afford no justification whatsoever for defendants to appropriate plaintiff's composition and use it or any part of it in the production of a photoplay—and this, of course, includes the writing of a scenario for it—without compensating plaintiff for the value of his story. And the further fact, if it be a fact, that the basic idea for the photoplay had been conveyed to defendants before they saw plaintiff's synopsis, would not preclude the finding of an implied (inferred-in-fact) contract to pay for the manuscript, including its implemented idea, if they used such manuscript.

*The Complaint; Failure of Proof, or Variance; Amendment.* Defendants urge in support of the summary judgment that although in plaintiff's amended complaint he alleges a contract by defendants to pay him if they used his entire 65-page story based upon the life of Floyd Collins, plaintiff's testimony is that such story was actually never submitted to defendants, but rather only the synopsis thereof, and that therefore there was a complete failure of proof. Plaintiff, following entry of the summary judgment, moved the court for an order setting aside the judgment and permitting plaintiff to file an amendment to his amended complaint, alleging submission of the synopsis instead of the 65-page story. The motion was denied and defendants argue that the amendment would have substituted a different cause of

action after the statute of limitations had run. This contention is without merit.

Section 469 of the Code of Civil Procedure provides that ''No variance between the allegation in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits. Whenever it appears that a party has been so misled, the court may order the pleading to be amended upon such terms as may be just.'' Section 470 states that ''Where the variance is not material, as provided in the last section, the court may direct the fact to be found according to the evidence, or may order an immediate amendment, without costs.'' Section 471: ''Where, however, the allegation of the claim or defense to which the proof is directed, is unproved, not in some particular or particulars only, but in its general scope and meaning, it is not to be deemed a case of variance, within the last two sections, but a failure of proof.''

The variance between plaintiff's pleading and proof in the present case obviously did not mislead defendants, since when making their motion for summary judgment they relied upon his testimony that he had submitted his synopsis to them, rather than the entire 65-page story. (See *Chelini* v. *Nieri* (1948), 32 Cal.2d 480, 486 [196 P.2d 915].) Further, such a variance clearly did not constitute a complete failure of proof of the general scope and meaning of plaintiff's claim, but merely a showing that his story was submitted in shorter form than that alleged in the complaint.

Great liberality is indulged in matters of amendment to the end that lawsuits may be determined upon their merits. (See *Klopstock* v. *Superior Court* (1941), 17 Cal.2d 13, 19-20 [108 P.2d 906, 135 A.L.R. 318], and cases there cited.) In the Klopstock case it was declared that ''In determining whether a wholly different cause of action is introduced by the amendment technical considerations or ancient formulae are not controlling; nothing more is meant than that the defendant not be required to answer a wholly different legal liability or obligation from that originally stated. As the court says in . . . [*Frost* v. *Witter* (1901), 132 Cal. 421, 426 (64 P. 705, 84 Am.St.Rep. 53)], for the purpose of determining whether amendment is possible, the 'cause of action' referred to as furnishing the test means only the legal obligation which it is sought to enforce against the defendant. Other courts have used almost identical language; the test

is not whether under technical rules of pleading a new cause of action is introduced, but rather, the test is whether an attempt is made to state facts which give rise to a wholly distinct and different legal obligation against the defendant. The power to permit amendment is denied only if a change is made in the liability sought to be enforced against the defendant. [Citation.]''

In the present case it is obvious that the proposed amendment would not constitute an attempt to state facts which would give rise to a wholly distinct and different legal obligation against defendants, but would only make the pleading conform to the plaintiff's testimony as to the manner in which his story was submitted to defendants. It is for defendants' claimed use of the same story as that already alleged that plaintiff still would be seeking recovery under the proposed amendment. Such amendment should have been allowed.

Plaintiff has also attempted to appeal from an order denying his motion to set aside the summary judgment and to permit him to file an amendment to his amended complaint. Such order is not appealable, and the attempted appeal therefrom will be dismissed. (See *Bank of America* v. *Oil Well Supply Co.* (1936), 12 Cal.App.2d 265, 271 [55 P.2d 885]; *Werner* v. *Sargeant* (1953), 121 Cal.App.2d 833, 834-835 [264 P.2d 217].)

The attempted appeal from the order denying plaintiff's motion to set aside the summary judgment and to permit him to file the amendment to his amended complaint is dismissed. The judgment is affirmed as to the second and third counts of the complaint, but as to the first count it is reversed and the cause is remanded for further proceedings not inconsistent with the views expressed in this opinion.

Gibson, C. J., Shenk, J., Traynor, J., Spence, J., and McComb, J., concurred.

CARTER, J.—I concur *only* in the result reached in the majority opinion. I dissent from, and heartily deplore, the lengthy discussion of numerous principles of law wholly inapplicable and unnecessary to a determination of this matter. No good purpose is served by such a discussion other than to confuse the reader and the future state of the law so far as this type of case is concerned and other cases in general involving similar problems. I had always thought it the policy

of this court, and other appellate courts, to determine only the issues actually involved and to avoid dissertations on points of law having no bearing on those issues. Such useless, although learned, discussions must later be distinguished, dissented from, and finally overruled by subsequent decisions.

In reviewing a summary judgment ''The better rule is that the facts alleged in the affidavits of the party against whom the motion is made must be accepted as true . . .'' and if any facts are presented which give rise to a triable issue, the summary judgment must be denied (*Eagle Oil & Ref. Co.* v. *Prentice,* 19 Cal.2d 553 [122 P.2d 264]). *It is not the function of a reviewing court to pass upon or determine the issue itself.* Despite this well-settled rule, the majority opinion sets forth, at length, the two stories—plaintiff's synopsis and defendant's scenario and proceeds to dissect them with a scalpel and microscope. Further, the majority opinion directs that ''At the trial the trier of fact should proceed with nicety of discrimination in applying the evidence to resolve the issues.'' I had always thought that the well-settled rule was that the trier of fact, whether judge or jury, was the *sole judge of the evidence,* that it determined the weight to be accorded to such evidence, and the credibility to be accorded the witnesses! But now we find the trier of fact being directed by this court to use the same scalpel and microscope in examining the evidence. We also find the majority directing the trier of fact as to what inferences may, and may not, be drawn from certain evidence. I had also thought, prior to this case, that the inferences to be drawn were for the trier of fact!

If the only function of the court upon a motion for a summary judgment is to determine whether triable issues of fact exist, then the issues were joined: That plaintiff had a property interest in a certain literary and dramatic composition which he submitted to defendants on the condition that if defendants used said literary and dramatic composition, defendants would pay plaintiff for the use thereof; that defendants copied and used plaintiff's literary and dramatic composition and have not compensated him therefor. Whether or not the literary and dramatic composition had merit, whether or not defendants' production was so similar as to warrant the inference that defendants had copied plaintiff's work, and whether or not the evidence showed that plaintiff had submitted the same to defendants with the expectation of compensation if defendants used the literary and dramatic

work, were all questions of fact for the trier of fact. In other words, the defendants' motion for summary judgment was *improperly granted*. And the only function of this court is to review the action of the trial court in granting that summary judgment—in other words, to determine whether or not triable issues of fact existed. But a majority of this court has seen fit not only to take unprecedented flights of fantasy but to set forth learned discussions of inapplicable law and then direct the trier of fact at the new trial as to how it should perform *its* function in the judicial field.

Taking into consideration the length of the majority opinion, there is no necessity of here reiterating the evidence concerning plaintiff's submission of his literary work to defendant Wilder's secretary. We all are aware, I believe, that ideas may be taken from the public domain and woven into a plot, or story, which may present something new, different, and of value to one in the market for such merchandise. It does not require interminable discussion of how many plots there are, nor of what some writers have considered as plots, nor of the services rendered by doctors, lawyers, dentists and the like, to bring home to the average attorney that an old theme may be given new interest by a different interpretation thereof and that this different interpretation may have value to one in the business of purchasing that type of merchandise.

When we consider the difference in economic and social backgrounds of those offering such merchandise for sale and those purchasing the same, we are met with the inescapable conclusion that it is the seller who stands in the inferior bargaining position. It should be borne in mind that producers are not easy to contact; that those with authority to purchase for radio and television are surrounded by a coterie of secretaries and assistants; that magazine editors and publishers are not readily available to the average person. It should also be borne in mind that writers have no way of advertising their wares—that, as is *most graphically illustrated by the present opinion,* no producer, publisher, or purchaser for radio or television, is going to buy a pig in a poke. And, when the writer, in an earnest endeavor to sell what he has written, conveys his idea or his different interpretation of an old idea, to such prospective purchaser, he has lost the result of his labor, definitely and irrevocably. And, in addition, there is no way in which he can protect himself.

If he says to whomever he is permitted to see, or, as in this case, talk with over the telephone, ''I won't tell you what my idea is until you promise to pay me for it,'' it takes no Sherlock Holmes to figure out what the answer will be! This case is a beautiful example of the practical difficulties besetting a writer with something to sell—he is not permitted even to see the *secretary* in person—he must convey to her over the telephone the result of his efforts.

There is no necessity for the superfluous, even though learned, discussion of the ''law pertaining to contracts, express, implied-in-fact and implied-in-law, and quasi-contractual obligations, as related to ideas and literary property'' found in the majority opinion. In California we have code sections distinctly defining the various types of contracts and we have not been informed why those code sections are ineffective to deal with the problem of ideas and literary property. As a matter of fact, if I understand the majority opinion, it finally comes down to earth and relies on those code sections. In the majority opinion we find this statement: ''From what has been shown respecting the law of ideas and of contracts we conclude that conveyance of an idea can constitute valuable consideration and can be bargained for before it is disclosed to the proposed purchaser, but once it is conveyed, i.e., disclosed to him and he has grasped it, it is henceforth his own and he may work with it and use it as he sees fit. In the field of entertainment the producer may properly and validly agree that he will pay for the service of conveying to him ideas which are valuable and which he can put to profitable use. Furthermore, where an idea has been conveyed with the expectation by the purveyor that compensation will be paid if the idea is used, there is no reason why the producer who has been the beneficiary of the conveyance of such an idea, and who finds it valuable and is profiting by it, may not then for the first time, *although he is not at that time under any legal obligation so to do, promise to pay a reasonable compensation for that idea*—that is, for the past service of furnishing it to him— and thus create a valid obligation.'' (Emphasis added.) It seems to me most obvious that a seller of literary work would not disclose his ideas incorporated in his work to a prospective purchaser of the same without an implied understanding on the part of both that such an idea, if used by the one to whom it was disclosed, would be paid for by the one in a position to use the literary work. The very positions

occupied by the buyer and seller would be sufficient to raise an implication that the one offering the literary work, and the one to whom it was disclosed, had agreed, impliedly that if the literary work were used by the one to whom it was shown, or offered, it would be paid for. It should not be necessary to lay down so many cast-iron rules when really the only question involved is the use made of the proffered work without compensation being made therefor. The buyer, or one to whom the literary work was offered, is adequately protected from unfounded claims by the rules defining a protectible literary work and by the fact that the trier of fact must find that the one accused of an unauthorized use of the literary work had access thereto, that the author's work bears a reasonable resemblance to that produced by the defendant. I disagree with the statement in the majority opinion that: "The idea man who blurts out his idea without having first made his bargain has no one but himself to blame for the loss of his bargaining power." It seems to me that in the ordinary situation, when the so-called "idea man" has an opportunity to see, or talk with, the prospective purchaser, or someone in his employ, it is at that time, without anything being said, known to both parties that the one is there to sell, and the other to buy. This is surely true of a department store when merchandise is displayed on the counter—it is understood by anyone entering the store that the merchandise so displayed is for *sale*—it is completely unnecessary for the storekeeper, or anyone in his employ, to *state* to anyone entering the store that all articles there are for sale. I am at a loss to see why any different rules should apply when it is ideas for sale rather than normal run of merchandise. It is quite true that one need not pay for ideas as such which are in the public domain but when those ideas have been so treated that they have worth or value to a prospective purchaser, it is difficult to understand why it is necessary that the seller should definitely state that he is selling his merchandise to a prospective buyer. It appears to me that the positions occupied by the parties should be sufficient to raise the inference that if the literary work is used by the prospective buyer, compensation would be paid therefor regardless of how much time the buyer takes to decide whether he will use it.