Filed 4/26/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FOXCROFT PRODUCTIONS, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> UNIVERSAL CITY STUDIOS, LLC, <br><br> Defendant and Appellant. | B303161 <br><br> Los Angeles County Super. Ct. No. BC683206 <br><br> **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** <br><br> [No change in Judgment] |

THE COURT:

IT IS ORDERED the opinion in the above-entitled matter filed on March 30, 2022, be modified in three ways:

1. On page 16, in the first full paragraph, the sentence "As Hirsch agreed, episodic photoplays are episodes" shall be replaced with:
    As Hirsch agreed, this meant episodes for a series.

2. On page 19, at the end of section II.B and before the beginning of section II.C, the following two paragraphs shall be added:

For the first time on appeal, the writers raise three new arguments for why the court should not have granted a new trial. First, they argue Universal could not deduct standard fees when it distributed Columbo episodes through foreign syndication, re-runs, home video, and other distribution means because these methods exploit subsidiary rights rather than photoplays. Second, they claim Universal cannot deduct standard fees for first-run Columbo episodes distributed as a "series." Third, they assert it is unconscionable to allow Universal to deduct its distribution fees.

The writers forfeited these arguments by failing to raise them in the trial court. As to their first and second new arguments, the writers say they "consistently emphasized" the difference between photoplays and "subsidiary rights in the series," but that is not the same as stating an argument. The writers' appellate briefing made no attempt to establish they raised the third argument at trial. The three theories are new. We decline to consider them.

3. On page 25, after the final sentence, which ends with the words, "which are now moot," the following sentence shall be added:

As the writers stated in their opening brief, "If the new trial order is affirmed, appeal of other aspects of the judgment will await entry of judgment after retrial."

There is no change in the judgment.

The petition for rehearing is denied.

_____

GRIMES, Acting P. J.          STRATTON, J.          WILEY, J.

Filed 3/30/22 (unmodified opn.)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FOXCROFT PRODUCTIONS, INC., et al., | B303161 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. No. BC683206 |
| v. | |
| UNIVERSAL CITY STUDIOS LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard J. Burdge, Jr. and David S. Cunningham III, Judges.  Reversed in part and affirmed in part.

Burkhalter Kessler Clement & George, Alton G. Burkhalter, Daniel J. Kessler, Keith E. Butler; Greines, Martin, Stein & Richland, Robert A. Olson and Alana H. Rotter for Plaintiffs and Appellants.

O'Melveny & Myers, Daniel M. Petrocelli, Timothy B. Heafner; Hueston Hennigan, Robert N. Klieger and Rajan S. Trehan for Defendant and Appellant.

————————————

We must define a key contract word: "photoplays." This word includes television *episodes* of Columbo, says the studio that made this long-running television show. The creators of the Columbo character disagree. They say the word photoplays has many meanings and is ambiguous—but it cannot mean what the studio says. The studio, however, is right: *photoplays includes episodes*. That resolves the core of this contractual dispute.

The court held a trial without defining photoplays for jurors, who found the studio breached its contract about Columbo. After this verdict, however, the court came to agree with the studio: defining the contract word was an issue for the court and not the jury, and a *photoplay meant "any video recorded program*," which included episodes of Columbo. The court granted the studio's motion for a new trial but denied its motion for judgment notwithstanding the verdict.

These rulings were right. The interpretive task was for the court, not the jury. The court's interpretation of photoplays was correct, as was its order for a new trial. The trial court also properly refused to give the studio the judgment outright.

The pretrial summary adjudication of a fraud claim was, however, in error. We reverse this ruling.

## I

Events began in the 1960s, when two writers entered a decades-long relationship with Universal City Studios, LLC. The relationship fell into litigation in 2017, when these writers sued Universal, alleging the studio owed them money from a 1971 contract. The facts span half a century.

A

We divide this long story into three little chapters. First we summarize Columbo's origin. Next we recount the 1971 contract at issue. Then we sketch later events.

1

William Link and Richard Levinson invented the character of a detective named Columbo. Foxcroft Productions, Inc. is Link's company. Fairmount Productions, Inc. is Levinson's company. In their work here as writers and producers, Link and Levinson were a team. For simplicity, we sometimes refer to this team, or their companies, as "the writers."

In 1962, the team's stage play about Columbo toured in 56 cities.

In 1967, Link and Levinson licensed the television and movie rights to their play to Universal. They also sold Universal the rights to the Columbo character. Link and Levinson remained involved with Columbo, however, through several agreements with Universal. Link and Levinson agreed, for fixed compensation, to write and to executive produce a television movie based on their play.

In 1970, a different writer wrote the script for a second Columbo television movie that served as a pilot. NBC picked up the show for a television series.

2

A 1971 contract is the linchpin of this case. Link and Levinson entered this contract with Universal about the right to produce and distribute their work for up to three years. This arrangement applied both to their work on Columbo and to their other projects.

Marvin Moss, an agent from a major talent agency, led negotiations for Link and Levinson.  Attorney Barry Hirsch, who had worked in entertainment law since approximately the early 1960s, also represented them.

The 1971 negotiations culminated in a 17-page contract.  The contract has two parts:  a 15-page typed body (the Memorandum) and a two-page printed attachment (the Rider).  When we use the word "contract," we are referring to the whole deal:  the Memorandum and the Rider together.  We excerpt these two parts in turn.

a

The Memorandum is typed on Universal letterhead.  Executives at Universal negotiated the Memorandum's terms with the writers' representatives, Moss and Hirsch.  A Universal typist then put the Memorandum on paper.

The Memorandum is not a form contract.  Its terms are personalized to the particulars of the ongoing relationship between Universal and the team of Link and Levinson.

The Memorandum is long, organized, and detailed, but contains no section devoted to definitions.  It uses the words photoplay or photoplays more than two dozen times.  Sometimes it uses this noun alone and unmodified:  photoplay.  Other times it modifies the noun in five ways:  television photoplays, anthological photoplays, episodic photoplays, pilot photoplay, and feature-length photoplay.

The Memorandum's paragraphs display structural logic.  We tour them, pausing where appropriate.

The first paragraph specifies a guaranteed annual payment to the writers.  The second paragraph lists their writing and producing duties.  The third paragraph sets dollar sums of " 'per

4

assignment' compensations" for an array of specified possible jobs involving executive producing, producing, and writing. This paragraph has subsections, sub-subsections and so forth. Covering 11 pages, it is the Memorandum's longest section. The guaranteed annual payment subsumes the per assignment compensation unless the latter exceeds the former, in which case Universal would pay the writers the greater sum.

The fourth and fifth paragraphs spell out other payments Universal would make to the writers: script consultant fees, contractual royalties, sequel royalties, and residuals. For the most part, these payments would be in addition to the guaranteed annual payment. These sums are not at issue here.

The sixth paragraph introduces the topic of this case: net profits. This provision grants the writers a share of net profits under certain conditions. "The computation of net profits shall be *as per the attached [Rider].*" The italics are ours.

b

The Rider is attached to the Memorandum. This two-page printed form sets out a general formula for calculating and dividing net profits between Universal and the writers.

The Rider devotes more than half of its text to definitions. Examples of its nine defined terms are Gross Receipts, Distribution Expenses, and Production Costs. Photoplay is not a defined term.

The Rider uses the singular or plural version of the word photoplay more than 40 times. Most uses are unmodified: photoplay. The exceptions are references to feature-length television photoplays and pilot photoplays. There are no references to anthological photoplays, episodic photoplays, or other modified uses of the word photoplays.

5

After the definitions, the Rider discusses accountings and payments. This section requires Universal to provide periodic accounting statements. Accounting statements would not be required, however, during periods when the writers were not entitled to any payments.

For this appeal, the Rider's crucial provision is its paragraph C, which authorizes Universal to act as the distributor of "the Photoplays." This paragraph allows Universal to treat its distribution fees as expenses that reduce net profits. Thus, the larger Universal's distribution fees, the smaller the net profits Universal would share with the writers.

Paragraph C includes a cap on the size of Universal's distribution fees that is significant in this case. We emphasize the key words: "such fees and charges shall not exceed those charged by [Universal] according to its then existing *standard practices*, applicable to photoplays owned, financed or distributed by [Universal], and in all other matters affecting gross receipts, distribution expenses, and production costs [Universal] shall adhere to the same practices and procedures according to which it normally conducts its business at the time in question with respect to photoplays owned, financed or distributed by [Universal]."

3

Columbo was a hit. Universal's trial counsel called it "incredibly successful." Gross receipts for Columbo totaled about $600 million. NBC broadcast Columbo from 1971 to 1978. Link and Levinson produced the first season. ABC broadcast a second cycle of the show from about 1989 to 2003.

Universal financed and paid for the *production* of both cycles of Columbo. That is, Universal did the work of making the

6

show, including hiring and paying writers, actors, directors, camera operators, lighting and sound crews, wardrobe teams, editors, makeup artists, set designers, and the other personnel. Universal found the filming locations, supplied studios, equipment, post-production work, and so on.

Universal also *distributed* the show. Distribution is the process of finding licensees and negotiating contracts to license programs. Universal negotiated agreements with television networks to air the original broadcast and to license the right to exhibit Columbo nationally and internationally. When Universal distributed programs itself, it charged distribution fees as a percentage of gross receipts. Universal said its distribution fees totaled about $160 million.

Before the second cycle began, the parties believed the first cycle of Columbo was not in net profits. In 1988, Link and Levinson negotiated an amendment to the 1971 contract to preclude Universal from offsetting losses from the first cycle against potential profits from the second cycle. The amendment also modified the definition of net profits to specify how Universal would account for home video receipts.

According to Universal, it did not send accounting statements to the writers because it did not believe the show was in net profits.

In 2013, Link asked for an accounting and an audit of Universal's books.

Universal contends it was allowed to cross-collateralize losses from the second cycle against profits from the first cycle, but it elected not to do so. According to Universal, this meant the first cycle of Columbo was in a net profits position.

In November 2016 and January 2017, Universal sent accounting statements and checks of over $2.3 million each to Foxcroft and Fairmount for their portions of net profits. Universal later sent statements for the years 2016 and 2017 along with checks that totaled over $200,000 each to Foxcroft and Fairmount for their portion of net profits in 2016 and 2017.

### B

In November 2017, Foxcroft and Fairmount sued Universal. The writers alleged Universal breached the 1971 contract. The main theory of their complaint was Universal owed the writers accounting statements and net profit payments, but Universal had not given the writers the statements and payments they deserved.

The writers also alleged Universal committed fraud by entering the 1971 contract and by not sending accounting statements. They alleged but later dismissed other causes of action.

In September 2018, Universal moved for summary judgment based on the statute of limitations. The court granted summary adjudication of the fraud claim. The court ruled the writers had suspicions that required them to investigate their concerns on a timely basis, which they had not done, according to the court's analysis. The court denied Universal's statute of limitations argument as to the contract claim, which was partly based on the writers' challenge to the accuracy of a 2016 accounting statement.

Trial proceeded in three phases: a jury trial with a special verdict, a bench trial to decide remaining contract issues, and an accounting referee panel to determine damages.

8

Shortly before trial, the case was assigned to a new judge. The new judge held a hearing to determine which contract interpretation issues should go to the jury. The Rider allowed Universal, when it distributes "photoplays," to retain distribution fees according to its standard practice. The writers contended photoplays could mean many different things, they needed extrinsic evidence to interpret it, and the jury should interpret the word. Universal said photoplays in the Rider had a single meaning that included episodes of Columbo. Universal asked the court to interpret the 1971 contract and the word photoplays as matters of law.

The court said it would decide later whether to allow the jury to make a special verdict finding about the meaning of photoplays.

The five-day jury trial was in February and March 2019. The main trial issues were whether Universal could deduct distribution fees and whether the writers' contract claims were within the statute of limitations.

Concerning distribution fees, the writers contended the word photoplays was ambiguous and the jury should construe it against Universal, meaning Universal breached the contract by deducting those fees from the studio's net profits. The writers also argued Universal could not subtract any distribution fees because it failed to negotiate these fees, failed to attach a distribution fee schedule, and did not prove the fees it took were its standard practice in 1971.

Among the trial witnesses were Hirsch, who was Link and Levinson's lawyer in 1971, and Arnold Shane, who had worked for Universal from 1966 through 1990. Shane did not negotiate the 1971 contract but the contract named Shane as a recipient of

a carbon copy of that document.  The jury also heard from Link, from Levinson's daughter, and from an accountant for the writers.  Universal's person most knowledgeable about certain topics was witness Milinda McNeely.  McNeely is an attorney who did not begin at Universal until 2015 but who had researched old Universal files concerning this case.

By the time of trial, Levinson and the agent, Moss, had died.

We summarize some trial testimony.

Hirsch testified the words "episodic photoplays" for a series in the Memorandum meant television episodes for a series.  He also said there are no standard terms for a profit participation deal with a studio.  "Everything's always negotiable."  He would negotiate distribution fees in every agreement, "if I can."

McNeely testified about a schedule of distribution fees that was Exhibit 9 at trial.  This Exhibit 9 is important in this appeal, so we describe it.

Exhibit 9 is a schedule.  This one-page typed document begins with the words, "Distribution charges shall be the following percentage of gross receipts."  The schedule then lists six categories of exhibitions, ranging from "First National Exhibition" to "Foreign Exhibition," with assigned percentages ranging from 10 percent to 50 percent.  Exhibit 9 thus lists by percentages how Universal would calculate its distribution fees.

Universal contended Exhibit 9 was its standard distribution fee schedule for 1971.  Universal's 1971 contract with Link and Levinson did not, however, attach Exhibit 9 or any other distribution fee schedule.

McNeely testified Universal appended Exhibit 9 to some 1971 profit participation deals but not to others.  The writers

elicited McNeely's deposition testimony that there were "quite a few" other contracts where Universal omitted a schedule like Exhibit 9. McNeely could not explain why some contracts appended Exhibit 9 but others did not. The writers argued that this evidence showed Universal in 1971 did not have a standard distribution fee.

The writers also elicited McNeely's deposition testimony that Exhibit 9's schedule bore no relationship to actual costs or expenses incurred by Universal.

Shane, the retired Universal employee, said Universal indeed did have a standard distribution fee practice in 1971. He recited figures mirroring Exhibit 9.

Before the court submitted the case to the jury, Universal again asked the court to decide the distribution fee issue rather than send it to the jury. Universal contended this interpretive question was purely legal, with no conflicting evidence about the negotiation, drafting, or intent of the parties.

The court denied this request.

The writers argued to the jury that the word photoplays did not include episodes of Columbo, and that Universal breached the contract because Universal had had no standard distribution fees in 1971. On both points, Universal argued the contrary.

The jury returned special verdicts for the writers. Jurors concluded the 1971 contract did not allow Universal to deduct a distribution fee. The verdict form had other questions related to distribution fees. One of the questions was Question 4, which asked jurors to determine whether the Rider allowed Universal to deduct fees in the percentages described by Exhibit 9. The form's instructions told the jury to skip the other distribution fee questions, including Question 4, if it found Universal was not

11

allowed to take its distribution fees. Accordingly, the jury skipped these questions.

On the statute of limitations, the jury found in the writers' favor.

Phase two was a bench trial to resolve remaining issues. The court defined the word photoplays. It said the word was "intended to apply to any video recorded program" for which the writers are entitled to profit participations under the 1971 contract, "which includes individual episodes of Columbo."

The court explained, "I am absolutely convinced that there's no ambiguity as to what photo plays are in [the Rider]. . . . [¶] It's very clear that [the Rider] was attached to that agreement with the understanding that it would apply to 'Columbo,' and/or anything else that [the writers] produced for Universal during that period of time. So there may have been a pilot project. There may have been a movie. And it would have applied to all of those things. [¶] Which is why [the Rider] isn't limited to just one photo play. It's designed to cover anything that might be produced by [the writers]."

We pause here to reiterate. The trial court *after* trial did what Universal had been urging it to do *before* trial: it defined photoplay to mean *any video recorded program*, including episodes of Columbo.

The court also ruled the 1988 amendment was based on a mutual mistake of fact and the writers were entitled to rescind it.

In phase three, the court appointed a panel of accounting referees to calculate the writers' damages. Using the panel's recommendation, the court entered a judgment of over $70 million for the writers.

12

Universal moved for judgment notwithstanding the verdict as to both of the jury's findings. In the alternative, it asked for a new trial on the distribution fee issue. It also asked the court to vacate its decision to allow the writers to rescind the 1988 amendment.

The court denied Universal's motion for judgment notwithstanding the verdict but granted the motion for a new trial on distribution fees.

The court vacated its rescission of the 1988 amendment. The new trial would determine the propriety of distribution fees, and the court said about rescission that "we'll cross that bridge when we get there."

The court held the word photoplays included episodes of Columbo. The court explained, "unfortunately, I think I'm going to have to say it was my mistake. I should have instructed the jury that photoplay was intended to include the episodes of Columbo in the agreement." The court noted the writers' theory about the meaning of photoplay was a major part of their argument about distribution fees and it likely affected the jury's decision.

The court ruled Universal had preserved its argument about the meaning of photoplays. It likewise determined there was no extrinsic evidence about the word.

The court declined to grant judgment notwithstanding the verdict. As to the distribution fee issue, the court reasoned the jury's finding could have rested on an independent ground. The court cited the writers' theory that Universal could not take distribution fees because the parties did not negotiate the exact terms of these fees.

Both sides appealed.

13

## II

We analyze this case in six steps. First we validate the trial court's definition of "photoplays." Second, we show why that ruling meant the trial court was right to order a new trial. Third, we demonstrate why the trial court properly denied Universal's motion for judgment notwithstanding the verdict. Thus we affirm the orders denying this motion and granting a new trial. Fourth, we overturn summary adjudication of the writers' fraud claim. Fifth, we affirm the trial court's decision to vacate its ruling about rescission. Sixth, we note other issues that now are moot and that we do not reach.

## A

The trial court correctly interpreted the word photoplays to include episodes. In this case of textual interpretation, the trial court properly interpreted "photoplays" to mean "any video recorded program," including Columbo episodes.

Universal did not forfeit the "photoplays" issue. The writers attempt to frame this issue as a special verdict form problem that Universal forfeited. The trial court correctly found, however, the photoplay issue to be an issue of instructional error that Universal repeatedly raised.

We independently review contract interpretation when extrinsic evidence is not in conflict. (*Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 915.) We also independently review issues of law.

When interpreting any text, including contracts, the vital thing for lawyers and courts is to pore over the writing. To discern the parties' intent, we must read their document, line by line, over and over. The foundation for valid textual interpretation is the text. (*RMR Equipment Rental, Inc. v.*

14

*Residential Fund 1347, LLC* (2021) 65 Cal.App.5th 383, 395.) The text is the beginning and the end of our inquiry on this question, for the trial court found, and the parties agree, there is no useful or conflicting extrinsic evidence about the meaning of the word photoplays. The people who negotiated the 1971 contract do not recall the process or have passed away.

This detailed 1971 contract takes care to define many terms expressly. Yet it does not define the word it uses many dozens of times: photoplay. This suggests the parties shared an understanding of the word that eliminated the need for an express definition. The problem is to recover that shared understanding from the contract's usage.

The trial court solved this problem. Its interpretation of the contract is sound.

The trial court defined photoplay as "any video recorded program." That makes sense of every use of this word in the contract. Thus, a "television photoplay" is a video program shown on television. A "pilot photoplay" is a video program used as a pilot. And so on.

This definition eliminates ambiguity from the contract. It makes the contract into a coherent and logical document. That fact is powerful textual support for the trial court's definition, because the parties obviously toiled to state the meeting of their minds. Finding a way to make sense of their efforts honors their labor and their intention. That is the goal of textual interpretation in contract law: to discover and effectuate the parties' intent.

The text offers two further validations.

First, the Memorandum states Columbo "shall be considered a series" and also refers to "all photoplays of the

series."  This usage logically means "photoplays" must include episodes, for no one in this appeal suggests how the Columbo series can be broken down other than by episode.  The writers do not engage this "all photoplays of the series" language in their briefing.  Universal stresses these words.  The writers make no reply.

Second, the Memorandum lists types of services Link and Levinson agreed to perform.  One service was writing "episodic photoplays for series."  As Hirsch agreed, episodic photoplays are episodes.  Hirsch was the lawyer for the *writers*.  His testimony on this point, however, supported *Universal*.  The word photoplays thus encompasses episodes of Columbo.

The writers offer no competing definition of photoplays.  Instead, they say the word photoplays is ambiguous and therefore we must find it does not include episodes of Columbo.  Citing *Rebolledo v. Tilly's, Inc.* (2014) 228 Cal.App.4th 900, 913, the writers say ambiguities are to be construed against the drafter.

Universal does not contest this rule about ambiguity.  (Cf. *Farmers Automobile Ins. Assn. v. St. Paul Mercury Ins. Co.* (7th Cir. 2007) 482 F.3d 976, 977 (opn. of Posner, J.) [the argument for this rule is "pretty feeble" when made by a sophisticated commercial actor rather than an individual consumer].)  Rather, Universal accepts the rule but says it does not apply because the contract is not ambiguous.

The writers' argument fails because there is no ambiguity.  The Memorandum often uses the word photoplay with modifiers, like "feature-length photoplay" to refer to a movie or "pilot photoplay" to refer to a pilot episode.  When used alone, the word photoplay is broad and can mean each of these different terms.

16

The inclusive nature of the word shows it encompasses many things, including episodes of Columbo.  It shows the trial court was right to define photoplay as any video recorded program.

An example illustrates the point.  Suppose an author contracts to write books.  The contract uses the words "fiction books," "fantasy books," "children's books," and "ebooks."  A term of the contract referring simply to "books" would be broad and unambiguous.  It would include all types of books.  The same is true for "photoplays" in the 1971 contract.

The trial court's interpretation of "photoplays" fits case law.  In *Photoplay Publishing Co. v. La Verne Publishing Co.* (3d Cir. 1921) 269 F. 730, 731, the United States Court of Appeals for the Third Circuit discussed the word's origin.  First published in 1911, "Photoplay Magazine" took its name from "a contest for a 'new one-word name for a "moving picture show." ' " (*Ibid.*)  The goal of the contest was " 'to select a name which would be descriptive of the entertainment given in motion picture theaters.' " (*Ibid.*)  The contest judges "selected the word 'Photoplay' as being 'more closely descriptive * * * than any other of the long list submitted.'  In announcing their decision, the judges stated that they were influenced in their selection 'by the necessity of adopting a term which would be easily remembered, descriptive in character, simple, and appropriate.'  The judges recognized in the word 'Photoplay' a term 'more closely descriptive of the entertainment given in motion picture theaters * * * than in any other of the long list submitted.' " (*Ibid.*)  The word "denotes the reproduction of a play by means of photography." (*Id.* at p. 732.)

This account is from the dawn of movie history, long before the advent of television. It dovetails with the trial court's definition of photoplay as any video recorded program. The fit is perfect: it leaves no play in the joint.

The court's definition likewise meshes with California precedent. California courts have used "photoplay" as a generic term synonymous with films and television episodes. (E.g., *Desny v. Wilder* (1956) 46 Cal.2d 715, 724–725, 749–750 [using "photoplay" to refer to films]; *Martyn v. Leslie* (1955) 137 Cal.App.2d 41, 48, 51 [referring interchangeably to "episodes" and "television photoplays"].)

In sum, a proper grasp of this contract means the Rider allowed Universal to take distribution fees when it distributed episodes of Columbo.

As a final note, we observe parties to a different contract might expressly define the word photoplay to give it a different meaning. Private contracting allows parties to adjust their relationship to achieve their particular goals. We have not defined the word for all seasons.

B

The trial court was right to order a new trial. The court granted a new trial because errors of law infected the old trial. On an appeal from an order granting a new trial, the appellate court will determine as a question of law whether any challenged ruling was erroneous. Once we find that error, however, we cannot substitute our judgment for that of the trial court on the essentially factual question of prejudice. At that point, the issue is not whether we would find prejudice as an original matter. Nor is the issue whether the trial court's explanation supported a finding of prejudice. Rather, the sole issue is whether the order

18

granting a new trial, viewed in the light of the whole record, constituted an abuse of discretion. (*Treber v. Superior Court* (1968) 68 Cal.2d 128, 132.)

The new trial order was sound because the jury verdict relied on two legal errors. First, the court allowed the jury to interpret the contract, which was an error the trial court later and forthrightly acknowledged and, after the trial, sought to rectify. Second, the jury may have incorrectly interpreted the word photoplays to exclude episodes of Columbo. The trial court rejected that reading of the contract as untenable. On independent review, we affirm the trial court's legal analysis on these points.

Nor was there an abuse of discretion. The trial court had a sound grasp of the case. As an edifice, the verdict rested on a faulty foundation. The trial court found the fault, fixed it, and was fully entitled to rebuild anew.

C

The trial court correctly denied Universal's motion for judgment notwithstanding the verdict.

On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine if any substantial evidence, whether contradicted or not, supports the jury's verdict. (*Sweatman v. Dept. of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) If there is, we must affirm the denial of the motion. If the appeal challenging the denial of the motion raises purely legal questions, however, our review is independent. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

We proceed under a deferential standard because Universal's appeal is factual, not legal. Universal says *no* evidence supports any of the writers' alternative justifications.

19

This is incorrect.  We see this by examining just one of the writers' alternate theories.

One of the writers' theories was that the contract did not allow Universal to deduct distribution fees in the percentages described in Exhibit 9, which we already have described.  We also already have decided the contract gave Universal the right to deduct distribution fees.  But *how* was Universal to calculate these fees?  The Rider said, with our emphasis, these fees "shall not exceed those charged by [Universal] according to its *then existing standard practices . . . .*"  What were those?  Universal said Exhibit 9 set out its "standard practices."  The writers disagreed, saying Exhibit 9 was not attached to their 1971 contract and Universal could not explain why, which proved Universal had no "standard" practices.

The verdict form addressed this very issue.  It asked jurors to determine whether the Rider allowed Universal to deduct fees in the percentages described by Exhibit 9.  This was Question 4 on the verdict form.

But jurors never answered Question 4, because the form told them to skip the question if they found the contract barred Universal from deducting any distribution fees.  The jury made that finding, which the trial court and we have decided was incorrect as a matter of law.

The unanswered Question 4 thus poses a crucial issue in this appeal.

Universal's opening brief does not explain why Universal must prevail on Question 4 as a matter of law.  This brief quotes Question 4 but does not do the work of demolishing this issue, which is essential to its effort to gain judgment notwithstanding the verdict.

The evidence on the proper answer to Question 4 is in conflict. Hirsch testified there were no standard terms. Shane testified to the contrary. The jury could have believed Hirsch and rejected Shane entirely. Resolving this conflict is a question for a fact finder. It is not a reason to enter judgment notwithstanding the verdict.

As an alternative attack on this same ruling, Universal points to the statute of limitations. It says it is entitled to outright victory because the jury was wrong to let the writers past this statute.

There was, however, substantial evidence to back this jury finding. We cannot overturn the trial court's ruling on this ground.

To review this statute of limitations issue, the jury found the writers did not discover facts before November 14, 2013, that caused them, or would have caused a reasonable person, to suspect Universal had failed to pay them or to render required accounting statements. The jury made a separate finding for Link's company and for Levinson's company.

Evidence supports the jury's finding about the statute of limitations. We summarize it, first for Link and then for Levinson.

There was proof of Link's sincere trust. Link trusted Universal to pay him if the studio owed him money. He had worked with Universal for decades. "I had a long relationship with them, and I knew all the big people there, and I trusted them." When Universal sent him a check in 2016 for Columbo, that surprised Link. A reasonable inference was this tardy and surprising payment suggested something had been amiss at

21

Universal for a long time, something that unsettled Link's longstanding trust.

There is also evidence to support the finding based on Universal's conduct before that payment. By *not* sending accounting statements, Universal's omission represented to the writers that the show was not profitable. It would be logical to infer the writers understood the absence of accounting statements to mean Universal did not owe them money. In the end, however, Universal admitted it did owe them money, and sent checks for millions.

Universal also made direct representations. Link asked someone in finance at Universal why there were no profits. That person told Link, "I guess that there wasn't any money," and "He didn't have an answer." Link did not recall the date of that conversation. Alan Levine, an attorney who worked with Hirsch and represented Link and Levinson some time after the 1971 deal, said Shane told him in 1988 that the first cycle of Columbo was a long way from net profit. Levine interpreted this to mean the show was in a "deep hole." Being told there was not any money and the first cycle was in a deep hole would tend to make Link and Levinson believe Universal did not owe them money.

Universal relies on Link's 2018 statement that he "form[ed] a suspicion" he was "owed monies." He formed this suspicion "a long time ago," "maybe" at least 20 years ago.

This brief testimony is vague. In the context of this record, the jury had a sufficient factual basis for its finding.

Now we turn to Levinson. Universal's argument about Levinson is weaker than for Link. This evidence comes from Levinson's daughter, Christine Levinson. Before she received a

check from Universal in January 2017, she had "no idea" whether Columbo was profitable. This is insubstantial.

Universal ineffectively points to other testimony. Link told Christine Levinson about the potential of a lawsuit sometime before 2013, but this does not mean she shared the concern. The record is silent about the content of the conversation. Christine Levinson also testified Link was the "king of complainers" and he complained about everything. The jury could have concluded she did not take Link seriously.

We make inferences in favor of the judgment. To infer Christine Levinson shared Link's suspicions on this basis would be an improper inference against the jury's finding.

Finally, Universal points to statements Christine Levinson made about conversations with her mother, but the source of these statements is deposition testimony that was not included at trial. If we were to consider these statements, they were about the mother expressing frustration about a lack of profits from Columbo in spite of the show playing for many years. Frustration is not suspicion. Employees for instance may be frustrated by low salaries, but not suspect their employer has breached their employment contract. The writers also offered evidence that a show can be successful in a popular sense but not be profitable due to high production costs. A show's popular success, alone, would not necessarily make a reasonable person suspicious in this context. This does not overcome the other evidence that supports the jury's findings.

In short, the trial court correctly denied Universal's motion for judgment notwithstanding the verdict.

D

We reverse summary adjudication of the fraud claim because disputed fact questions plagued the statute of limitations issue.

In finding the statute of limitations barred the writers' fraud claim, the court relied on three facts: Link had vague suspicions; Link told Christine Levinson about the possibility of suing Universal; and Christine Levinson's mother's frustration.

This evidence was contested, as we just have shown. Link's supposed statement of suspicion was brief and vague. Other evidence gave a competing picture: Link had a long relationship with Universal, he trusted Universal would pay him, Universal represented there were no profits by failing to send accounting statements, and Universal employees said there was no money and the first run would never be profitable. The court said Christine Levinson "shared Link's belief," but this was at best an inference from the testimony and not something Levinson said. Disputed fact issues precluded summary adjudication of the fraud claim.

E

The court properly vacated its rescission of the 1988 amendment. Rescission is an equitable remedy. (*Cameron v. Evans Securities Corp.* (1931) 119 Cal.App. 164, 172.) We review an order granting rescission for an abuse of discretion. (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 401.) The parties do not offer authority on the standard of review for *vacating* rescission, nor have we found any. Given the court's considerable discretion in granting rescission, we apply a similarly deferential standard for vacating rescission.

The *writers* say the court should not have vacated the rescission, but their argument wrongly presupposes the new trial order was incorrect. This is the writers' only argument attacking the order vacating rescission. The trial court based its rescission order on the jury's distribution fee finding, which the trial court abrogated. The court did not abuse its discretion by vacating the rescission order.

On the other hand, *Universal* asks us to rule the rescission itself was improper. This issue is not ripe. The propriety of rescission turns on Universal's right to take distribution fees, and if so, the amount of the fees. A new trial will lend focus to these issues. The trial court then may revisit the question of equitable remedies in due course. (Cf. *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170–172 [a controversy is not ripe until the facts have sufficiently congealed to permit an intelligent and useful decision to be made].)

In sum, the court did not abuse its discretion.

## F

We do not reach issues about damages and a trial continuance, which are now moot.

25

## DISPOSITION

We affirm the orders granting a new trial and denying judgment notwithstanding the verdict. We reverse the summary adjudication of the fraud cause of action. All parties shall bear their own costs on appeal.

WILEY, J.

We concur:

GRIMES, Acting P. J.

STRATTON, J.